[No. 200,917-4. En Banc.]
Argued March 1, 2012. Decided July 12, 2012.

*In the Matter of the Disciplinary Proceeding Against*
Thomas F. McGrath, *an Attorney at Law.*

814

*Kurt M. Bulmer*, for the attorney.
*Francesca D'Angelo*, for the Bar Association.

¶1 CHAMBERS, J. — Thomas F. McGrath seeks review of a recommendation by the Washington State Bar Association Disciplinary Board (Board) that he be suspended from the practice of law for 18 months. The hearing officer found that McGrath intentionally and repeatedly obstructed and delayed litigation by failing to respond to discovery requests and by falsely certifying that he had made a reasonable inquiry into the accuracy of the responses he eventually gave. Further, while the trial judge was considering imposing sanctions for these discovery violations, McGrath sent two ex parte communications to the judge, disparaging the opposing party based upon her national origin. We conclude that the hearing officer's findings of fact are supported by substantial evidence. Reviewing the conclusions of law de novo, we also accept the officer's conclusions of law. With appropriate deference, we accept the recommendation of the Board and suspend McGrath from the practice of law for 18 months.

816

## FACTS AND PROCEDURAL HISTORY

¶2 McGrath's wife, Melinda Maxwell, owned two chiropractic businesses in the Seattle area, both named the Chiropractic Wellness Center (CWC). McGrath was the lawyer for CWC as well as its corporate secretary. Katherine Ellison is a Canadian citizen who worked at CWC. Ellison left to open her own chiropractic business after spending about three years at CWC. Upon Ellison's departure, McGrath filed suit on behalf of CWC, alleging, among other things, breach of the duty of loyalty and unfair competition. Ellison filed an answer and counterclaim, asserting that "CWC has engaged in the practice of hiring Canadians, promising them employment under certain terms, and then altering those terms after the Canadian has relied on the terms promised." Am. Answer (Ex. A-2) at 6. For example, Ellison claimed if the Canadian did not accept the new terms, "both their work visa and impending licensure would be jeopardized" by the potential loss of employment with CWC. *Id.*

¶3 In October 2007, CWC's complaint was dismissed with prejudice on summary judgment. Ellison's claims proceeded to trial, and on July 14, 2008, a jury awarded her approximately $500,000, finding, among other things, that she had suffered disparate treatment in her employment based on her alienage.

¶4 The litigation was "contentious." Second Am. Findings of Fact (FF), Conclusions of Law (CL), and Hr'g Officer's Recommendation, FF 3. Discovery was particularly difficult. First, in April 2007, Judge Cheryl Carey imposed sanctions on McGrath and Maxwell for discovery violations, finding:

> Ms. Maxwell, CWC, and Mr. McGrath falsely certified responses to requests for production as identified in this Court's findings of fact. This court finds that such conduct was willful, intentional, and geared to prevent Ms. Ellison from having

information necessary to litigate the claims identified in this court's finding of fact paragraph 1. This court finds that those responses were falsely sworn to induce Ms. Ellison and this court to believe that the responses were completely answered.

Order (Ex. A-24) at 10. Later, in March 2008, Judge Jim Rogers signed an order on a motion by Ellison for default. Judge Rogers denied the motion but granted alternative relief for discovery violations by ordering a spoliation of evidence instruction be presented to the jury. Specifically, Judge Rogers noted that "[i]n this case, that test [for presenting such an instruction] is easily met." Order on Mot. for Default by Ellison (Ex. A-28) at 5. At the disciplinary hearing, the hearing officer found that McGrath repeatedly failed to make good faith efforts to fulfill discovery requests.

¶5 In response to Ellison's motion for default for discovery violations, McGrath submitted two ex parte communications to Judge Rogers. Both referred to Ellison's national origin and one asked that her assets be frozen. These ex parte communications will be detailed later. After the trial, concerned about these communications, Judge Rogers filed a grievance against McGrath.

¶6 The hearing officer found McGrath had engaged in four separate instances of conduct in violation of the Rules of Professional Conduct (RPC). The first two violations involved McGrath's significant failures to respond to discovery requests and falsely certifying compliance with discovery rules. The third was based on McGrath's demonstrated prejudice and bias toward the opposing party based on national origin. The hearing officer found a fourth violation because McGrath communicated ex parte with the judge in his case without authorization. The hearing officer concluded that the second, third, and fourth violations caused actual harm, and he suspended McGrath for 3 months. The Board adopted the hearing officer's findings but decided the length of the suspension was insufficient; it

increased the suspension to 18 months. McGrath contests the recommendation.

## ANALYSIS

### STANDARD OF REVIEW

■■ ¶7 This court has ultimate responsibility for attorney discipline in Washington. *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 329, 157 P.3d 859 (2007) (citing *In re Disciplinary Proceeding Against Cohen*, 150 Wn.2d 744, 753-54, 82 P.3d 224 (2004)). We uphold challenged findings as long as they are supported by substantial evidence. *Id.* "Substantial evidence exists if a rational, fair-minded person would be convinced by it. Even if there are several reasonable interpretations of the evidence, it is substantial if it reasonably supports the finding. And circumstantial evidence is as good as direct evidence." *Rogers Potato Serv., LLC v. Countrywide Potato, LLC*, 152 Wn.2d 387, 391, 97 P.3d 745 (2004) (citations omitted). We give great weight to the hearing officer's findings of fact, especially where the veracity of witnesses is concerned. *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 208, 125 P.3d 954 (2006) (citing *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 58, 93 P.3d 166 (2004)). We review conclusions of law de novo. *In re Disciplinary Proceeding Against Stansfield*, 164 Wn.2d 108, 119, 187 P.3d 254 (2008) (citing *Guarnero*, 152 Wn.2d at 59).

### DISCOVERY DISCIPLINE

1. *Facts Relating to Discovery*

¶8 The hearing officer found that "[McGrath] continually interposed general and specific objections to Ellison's discovery requests," many of which "were not made in good faith." FF 4. The hearing officer also found, "Respondent violated RPC 8.4(d) in providing discovery responses to opposing counsel without conducting a reasonable inquiry

into the truthfulness of the responses in circumstances where inquiry and investigation by respondent was clearly called for." CL 1 (count I). McGrath challenges these findings. A rather detailed discussion of the discovery violations is required for the reader to fully appreciate the conduct before us.

¶9 Among other things, Ellison requested "a full and complete personnel roster, identifying all individuals employed by [CWC] for a period of [five] years before the hiring of . . . Ellison to present." Request for Production (RFP) 9 (Ex. A-4). She also asked for the position held by each employee, the dates of the employment, and the reasons for separation. McGrath objected to this request, stating that it was "duly [sic] burdensome and [was] promulgated with the intent to harass and/or intimidate and will not likely lead to the discovery of relevant evidence." Pl.'s Resp. to RFP (Ex. A-5) at 4. McGrath produced only the names and last known addresses of the chiropractors that were employed by CWC since 1999. He did not produce a personnel roster or contact information for any other employees.

¶10 Ellison also requested copies of all time cards for each and every chiropractor hired by CWC at both locations. RFP 18 (Ex. A-4). These time cards were documents that were required to be kept by the chiropractors and were important to prove Ellison's disparate wage claims. McGrath objected, alleging that the request was harassing, burdensome, and unlikely to lead to relevant evidence. He also stated, "Chiropractors were not ordinarily required to have a time card. Therefore [th]is information is not available. Further, there are no records prior to 2000." Pl.'s Resp. to RFP (Ex. A-5) at 6.

¶11 Ellison requested the production of any and all records of income paid to another Canadian employee, Belinda Steenburg, "including any and all W-2s generated during her employment." RFP 21 (Ex. A-4). These records were sought to show how CWC treated Canadian employees

compared to the American employees. McGrath objected to this request, stating that "Steenburg was not a Chiropractor and a Canadian citizen" so the amount paid to her was not relevant or likely to lead to the discovery of relevant evidence. Pl.'s Resp. to RFP (Ex. A-5) at 6.

¶12 Ellison also requested copies of the marketing calendars for each clinic and the marketing calendar for every chiropractor that worked in the clinics. McGrath objected to both, stating respectively that "Ellison must define what a 'Marketing Calendar' [sic]" and "What is a 'Marketing Calendar.' " Pl.'s Resp. to RFP (Ex. A-5) at 7. In fact, a "marketing calendar" was a specific compilation of information and dates described in CWC's office manual and was a term well understood by CWC and McGrath. This term was identified in the office manual and job descriptions that McGrath produced as a response in these same requests. McGrath testified that he knew what a marketing calendar was "but we didn't know if they did." 3 Transcript (Tr.) at 553.

¶13 The court found that CWC exercised bad faith in making its responses to Ellison and that "CWC's use of generic and blanket general objections, cut-and-paste objections to essentially all of the discovery requests, and refusal to provide responses to questions as basic as asking CWC to produce an employee roster violated CWC's duty to exercise good faith under both CR 26 and CR 37." Order on Mot. to Compel (Ex. A-15) at 2. The court ordered CWC to withdraw all general and boiler plate objections to Ellison's first requests. Further, the court ordered CWC specifically to produce documents, including the Steenburg documents, the personnel roster, time cards, and marketing calendars. The court also ordered CWC to pay $250 in sanctions to Ellison.

¶14 On February 23, 2007, McGrath submitted a supplemental response. His response contained the same general objections that the court had found to be boiler plate and had ordered withdrawn. While an employee roster was

provided, it did not list telephone numbers or the reasons for termination of employment. McGrath did not produce time cards but instead certified that "[t]he time cards have not been retained and therefore [are] not available." Suppl. Resp. to RFP (Ex. A-16) at 6. Even though the court had directed him to produce Steenburg's file, McGrath refused, stating that Steenburg "apparently was an independent contractor in marketing matters and a W-2 was not required. There is no law against paying an independent contractor with cash." *Id.* at 7. As to the marketing calendars, McGrath stated that if they had not already been produced, they did not exist. McGrath signed this document on February 23, 2007, signifying certification under CR 26(g).[1]

¶15 On March 27, 2007, McGrath prepared and certified a second amended response. This response included an amended roster, which purported to contain Maxwell's best recollection as to each employee. McGrath again refused to provide the employee file for Steenburg. Both McGrath and Maxwell certified that there were no time cards or marketing calendars for the professional, salaried chiropractors. McGrath stated that "all emails that are available have been produced," while admitting for the first time that there may have been more e-mails kept on Maxwell's personal computer but that their information technology support technician was on vacation and had not retrieved them. Pl.'s Second Am. Resp. to RFP (Ex. A-18) at 3.

¶16 Two days after McGrath and Maxwell certified the second amended responses, Ellison's lawyer took Maxwell's deposition. In that deposition, Maxwell admitted that CWC had time cards for the chiropractors and, in fact, she had

---

[1] CR 26(g) states in relevant part:

The signature of the attorney or party constitutes a certification that he has read the request, response, or objection, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is . . . consistent with these rules . . . not interposed for any improper purpose . . . and . . . not unreasonable or unduly burdensome or expensive.

seen them several months before. She testified that the time cards would have gone to her accountant, and then to storage, and that she never threw business records away. Maxwell testified that she had not produced them because she did not think that she had to. At the disciplinary hearing, McGrath testified that this was the first time that he learned that Maxwell had these documents in her possession.

¶17 When questioned at her deposition, Maxwell "immediately knew what a marketing calendar was." 1 Tr. at 182. She admitted that CWC kept marketing calendars, that they were sometimes maintained on paper, and that she never threw away business records. She also admitted that she had a " 'little file' " for Steenburg that she had not produced. 2 Tr. at 383. Ellison's counsel also learned at this deposition that two of Maxwell's computers, kept at McGrath's office, had never been checked for e-mails.

¶18 Ellison moved for sanctions for CWC's failure to comply with the court's order compelling discovery. In response, Maxwell filed a declaration saying that they had accessed e-mails from her computer only the day before and were reviewing them for privilege but that it would take some time because there were "hundreds and hundreds" of them. Decl. of Melinda Maxwell (Ex. A-22) at 5. She also stated that she had looked for and found numerous time cards, which would be provided. She attached some of these cards to her declaration.

¶19 On April 19, 2007, Judge Carey issued an order finding:

- CWC, Maxwell, and McGrath falsely certified responses to Ellison's requests for production;

- CWC, Maxwell, and McGrath acted in bad faith as to their other responses to discovery;

- CWC's, Maxwell's, and McGrath's actions were willful and intentional and undertaken to mislead both Ellison and the court;

- CWC, Maxwell, and McGrath willfully and intentionally disregarded the court's first order to compel; and
- CWC, Maxwell, and McGrath had actual knowledge of these violations.

Order (Ex. A-24) at 7-8.

¶20 Notwithstanding the court order, McGrath did not produce any of the Steenburg documents, the marketing calendars, or any additional time cards except Ellison's. In January 2008, Ellison moved for default judgment on liability and an order precluding CWC and Maxwell from presenting argument and evidence in defense of damages on their claims. After this motion was filed, McGrath produced some time cards from the other chiropractors.

¶21 On March 10, 2008, Judge Rogers denied the motion for default but ordered that a jury instruction on spoliation of evidence by CWC be given at trial. On July 14, 2008, a jury awarded Ellison back wages and general and punitive damages. A judgment was entered on October 30, 2008.

### 2. *McGrath's Contentions regarding Discovery*

Discovery Violations Should Be Addressed by the Trial Court, Not the Bar Association

¶22 McGrath first challenges the application of bar disciplinary sanctions to discovery violations. He asserts that it is "long standing public policy that where there are alleged discovery violations and those matters have been litigated to not re-litigate them again in the disciplinary system." Opening Br. of Resp't at 9. He bases this assertion on the fact that he has not been able to find any discipline imposed on the lawyers in the seminal discovery abuse cases *Firestorm* and *Fisons*. *See In re Firestorm 1991*, 129 Wn.2d 130, 916 P.2d 411 (1996); *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 858 P.2d 1054 (1993). The Washington State Bar Association (WSBA) counters this assertion effectively by providing a list of

instances in Washington and other jurisdictions where lawyers were disciplined at least in part for discovery abuses.

■ ■ ¶23 However, there is some substance to McGrath's observation. Trial judges have authority to oversee and enforce discovery matters before them. *See John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 777, 819 P.2d 370 (1991) (citing *Marine Power & Equip. Co. v. Dep't of Transp.*, 107 Wn.2d 872, 875-76, 734 P.2d 480 (1987) (citing and quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984))). Arguably, the trial judge is in a better position to assess discovery violations given the history, contested facts, and context of the discovery issues. Further, it would benefit neither the courts nor the bar disciplinary system if lawyers were quick to file competing grievances against one another for discovery failures during litigation. We do not encourage lawyers to file grievances during the heat of litigation. For these reasons, disciplinary sanctions for discovery violations have not been common. But where a lawyer disregards a trial court's clear order to comply with discovery, court imposed sanctions may be insufficient. Where the evidence establishes the lawyer has repeatedly failed to comply with discovery in one case or a series of cases, discipline sanctions are appropriate. Further, we encourage judges to file grievances if they feel their best efforts to achieve compliance with discovery orders are insufficient or if they believe a lawyer fails to understand discovery obligations. Ultimately, McGrath is wrong. Bar disciplinary sanctions are entirely appropriate for his conduct.

*3. McGrath's Contentions regarding the Findings of Fact*

¶24 McGrath challenges a number of the findings of fact. We address the specific objections in order.

¶25 Finding of Fact 4: The hearing officer found that "[McGrath] continually interposed general and specific objections to Ellison's discovery requests," many of which

"were not made in good faith." Specifically, the hearing officer used the example of the request for a marketing calendar. McGrath asserts there is no evidence he knew what marketing calendars were and that they existed in the form requested by the opposing party. This is contradicted by the record. As we noted above, the term "marketing calendar" was used in CWC's own employee manual. FF 4. Maxwell knew what they were, and McGrath admitted on the record he knew what they were. The conclusion that McGrath's discovery responses were not made in good faith is supported by substantial evidence.

¶26 Findings of Fact 9, 10, 13 (quoting various court orders): The hearing officer noted multiple court orders finding that Maxwell, McGrath, and CWC had, among other things, " 'exercised bad faith,' " " 'acted in bad faith,' " and failed to make " 'certain basic inquiries' " regarding discovery. McGrath argues these findings are based on trial court findings of bad faith and are thus irrelevant because they were originally found under a low burden of proof and are hearsay. However, the hearing officer expressly did not accept the court findings for the very reasons enunciated by McGrath. The officer noted they were probably found under a preponderance of the evidence standard and stated that "it cannot be found by a clear preponderance of the evidence that respondent knowingly made a false statement or violated a court order." CL 1 (count I). Instead, the court's findings were relevant to show that McGrath was on notice that his discovery responses were inadequate and that he should have conducted a reasonable inquiry into their truthfulness.

¶27 Finding of Fact 14: The hearing officer found McGrath's marriage, past representation of CWC, position as a CWC corporate officer, and general familiarity with CWC's business operations gave McGrath reason to believe he should have made further inquiry into the accuracy of his discovery responses. McGrath does not dispute the factual statements about his relationship with his client

and her business but argues there is no connection between being married to a client, being a corporate officer in the client's business, sharing office space where requested documents were kept, representing the client and business in the past, and having any knowledge about requested discovery. At the core of McGrath's argument is his failure to understand a lawyer's duty to make a reasonable inquiry into the accuracy of the information that the lawyer certifies is correct. The hearing officer properly relied on the cited factors as further evidence that McGrath was on notice as to the deficiency of his discovery responses and should have initiated further inquiry.

¶28 _Finding of Fact 15_: McGrath challenges the finding that his discovery conduct caused harm to the administration of justice but does not provide any argument on this point. We will therefore not consider it.

4. *McGrath's Contentions regarding the Conclusions of Law*

¶29 McGrath challenges several conclusions of law. The hearing officer found under count I that McGrath violated RPC 8.4(d)[2] when he "provid[ed] discovery responses to opposing counsel without conducting a reasonable inquiry into the truthfulness of the responses in circumstances where inquiry and investigation by respondent was clearly called for." CL 1 (count I).

¶30 Under count III,[3] the officer found McGrath's certification of his discovery answers was "a false representation to the court and opposing counsel that he had made a reasonable inquiry to determine that the responses were complete and correct," in violation of RPC 8.4(c)[4] and (d). CL

---

[2] RPC 8.4(d) prohibits "engag[ing] in conduct prejudicial to the administration of justice."

[3] Count II was dismissed by the hearing officer and is not at issue here.

[4] RPC 8.4(c) prohibits engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

1 (count III). Regarding counts I and III, McGrath continues to contend that he made a reasonable inquiry and that his certifications of the responses to discovery were accurate and proper. Again, his contentions are based upon his failure to understand the duties of a lawyer. Although McGrath may not have had actual knowledge of what documents were missing, he had actual knowledge that he had not made a reasonable inquiry. We accept the officer's conclusion that McGrath made an intentional misrepresentation in his certification.

## Ex Parte Contact Discipline

### 1. *Facts Relating to Ex Parte Contact*

¶31 As Judge Rogers was considering Ellison's motion for default based on McGrath's discovery violations, he received two letters from McGrath. The first was a typed letter regarding the motion for default. A handwritten message was scrawled on the bottom of the last page: "Your decision is going to effect [sic] American's [sic]—How [sic] are you going to trust & believe—a [sic] alien or a U.S. citizen. Thomas McGrath # 1313." Ex. A-26. The second was a single page, entirely handwritten:

2-20-08

Dear Judge Rogers;

How many jobs do we give to <u>aliens</u> like Dr. Ellison: She was schooled here in the U.S. and refuses to become a U.S. citizen. She needs to go back to Canada.

In that regard, I am asking the Court to freeze all of her assets pending the outcome of this case.

Thomas F. McGrath, Jr.

Attorney for π CWC

King County Sup. Ct.

Ex. A-27.

¶32 Judge Rogers, of his own accord, directed in his order on the motion for default:

Sanctions: Mr. McGrath shall show cause why sanctions should not be imposed for his comments in his letters (1) arguing that the Court should give greater credence to an American citizen based solely upon citizenship over a resident alien and (2) asking this Court to freeze a party's assets without giving any legal basis or following any court rules.

Order on Mot. for Default by Ellison (Ex. A-28) at 6. Ellison's counsel, after some confusion, realized that his files were missing the letters at issue. Counsel asked the court clerk for copies of those letters, which took some time to locate because they had never been formally filed. When the letters were finally received by counsel on the second day of trial and shown to Ellison, her lawyer later testified that "[y]ou could see the physical shock on her face." 1 Tr. at 211. Judge Rogers filed a grievance with the bar.[5] At the disciplinary hearing, McGrath acknowledged that sending the letters to the judge was "inappropriate" but only "because of the ex parte [contact] and not the content" of the letters. 3 Tr. at 510.[6]

### 2. *McGrath's Contentions regarding Ex Parte Contacts*

¶33 McGrath challenges findings of fact with respect to his ex parte contacts.

¶34 Finding of Fact 23: The hearing officer found that McGrath's "ex parte communications addressed matters at issue before the court and were intended by [McGrath] to be

---

[5] In his grievance, Judge Rogers explained, "I have not sanctioned Mr. McGrath as it appears to me that some form of discipline by the WSBA is the more appropriate process." Grievance (Ex. A-34).

[6] In his brief to this court, McGrath asserts that he referenced Ellison's Canadian citizenship to appeal to the judge's sense of patriotism. McGrath used the wrong word. Except indigenous peoples, all of us who are privileged to enjoy this great nation do so either because we or our ancestors immigrated here or were brought here in bondage. When our ancestors arrived, many could not speak English and toiled for little or no pay. Diversity of origin was certainly the national circumstance when our founders made a declaration that "all men are created equal" and endowed "with certain unalienable Rights." THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). Perhaps McGrath meant to appeal to the judge's sense of nationalism, but certainly not his sense of patriotism.

persuasive to the court on those issues." McGrath responds that there is no evidence the ex parte contact was intended to be persuasive and, in fact, he was just blowing off steam. Oddly, in his very next challenge (just two sentences later in his brief), McGrath states that the totality of the evidence "shows that his personal belief at the moment he sent the ex parte communications was that *he thought that Ellison's status supported an argument for relief* but he now knows that this position was not a valid argument." Opening Br. of Resp't at 12 (emphasis added). Substantial evidence supports the finding.

¶35 Finding of Fact 27: The hearing officer found that McGrath, "notwithstanding prior apologies, is of the belief that Ellison's national origin and immigration status supported a valid argument in support of the relief he sought." McGrath argues, as noted above, that he intended to be persuasive at the time of the ex parte contact, but his prior apologies show he now knows this was not a valid argument. There is substantial evidence to support this finding.

¶36 Finding of Fact 28: The hearing officer found that McGrath's "conduct caused actual harm to the public's view of the integrity of the bar and the administration of justice." McGrath responds that there is no evidence of harm to the public's view of the bar because the public never knew about his letters and no harm to the administration of justice because the judge ignored them and took no action based on them. Ex parte contact of the nature before us is very harmful to the public's view of the integrity of the bar. Unfortunately there are those, particularly those unfamiliar with the working of our judicial system, who are quick to believe that judges routinely have ex parte contacts with parties or their lawyers and are influenced by such contacts. Ex parte contacts intended to influence the judge diminish the integrity of the administration of justice. And it is demonstrably untrue that there was no harm to the administration of justice. Ellison's counsel testified that his client was physically shocked by the letters. The evidence

supports the finding that McGrath caused actual harm to the administration of justice.

¶37 McGrath also challenges the conclusions of law relevant to counts IV and V, wherein the hearing officer found that the letters violated RPC 8.4(h)[7] and RPC 3.5(b).[8] McGrath does not dispute that the letters were violations; he disputes only evidence of harm in connection with the level of sanctions to be imposed. McGrath is wrong for the reasons discussed under finding of fact 28 above. We accept the conclusions of law and, to the extent McGrath argues the issue of sanctions, that subject is discussed below.

## AGGRAVATING AND MITIGATING FACTORS

¶38 McGrath challenges the application of aggravating and mitigating factors.

¶39 Applying the American Bar Association's *Standards for Imposing Lawyer Sanctions* std. 9.22 (1991 & Supp. 1992) (ABA *Standards*), the hearing officer found four aggravators: (1) prior disciplinary offenses (McGrath was disbarred in 1982 following a conviction for second degree assault with a deadly weapon in which the victim was seriously injured); (2) multiple offenses (the hearing officer found four counts of violations by McGrath); (3) refusal to acknowledge the wrongful nature of his conduct; and (4) substantial experience in the practice of law. The hearing officer found one mitigator: that McGrath's previous disbarment was remote in time.

¶40 McGrath argues that the officer should have found an additional mitigator of sanctions already imposed for the same alleged misconduct being considered by the bar. McGrath notes he was already fined at least $5,290 for discovery violations. The WSBA responds that in fact

---

[7] RPC 8.4(h) prohibits "manifesting prejudice or bias on the basis of . . . national origin."

[8] RPC 3.5(b) prohibits "communicat[ing] ex parte with [a judge] during the proceeding unless authorized to do so."

McGrath was fined more than that, and more than once. Under some circumstances, it may be appropriate to consider sanctions imposed by a court when the disciplinary sanctions are for the same conduct. However, it appears that at the time of the disciplinary hearing, McGrath still owed $8,000 in unpaid discovery related fines. McGrath has consistently failed to comply with trial court orders and at the time of the hearing had still not completely complied with the court's sanctions.[9] Under the circumstances before us, McGrath is not entitled to an additional mitigator.

SANCTIONS

■ ■ ¶41 We use the ABA *Standards* as a guide to determine the appropriate sanction for misconduct. *In re Disciplinary Proceeding Against Eugster*, 166 Wn.2d 293, 314, 209 P.3d 435 (2009). The guidelines are not rigid but are designed to permit " 'flexibility and creativity in assigning sanctions.' " *Id.* at 315 (quoting ABA STANDARDS std. 1.3). We employ a two step process: first we consider the nature of the duty violated, the lawyer's mental state, and the harm caused; and second we examine aggravating and mitigating factors. *In re Disciplinary Proceeding Against Kronenberg*, 155 Wn.2d 184, 195, 117 P.3d 1134 (2005) (citing *In re Disciplinary Proceeding Against Cohen*, 149 Wn.2d 323, 338, 67 P.3d 1086 (2003)). No one factor is controlling; we examine the misconduct as a whole and in context. *Eugster*, 166 Wn.2d at 316.

■ ¶42 If suspension is the presumptive sanction, the baseline period of suspension is presumptively six months. *In re Disciplinary Proceeding Against Holcomb*, 162 Wn.2d 563, 582-83, 592, 173 P.3d 898 (2007). This court has sometimes referred to six months as a "minimum" period of

---

[9] The record indicates that at the time of the disciplinary hearing, discovery sanctions of $8,000 had "not been paid yet." 1 Tr. at 213. However, at oral argument, McGrath's counsel asserted his belief that all matters, including outstanding sanctions, were subsequently resolved in a settlement between the parties to the underlying lawsuit.

suspension. *E.g., In re Disciplinary Proceeding Against Behrman*, 165 Wn.2d 414, 426, 197 P.3d 1177 (2008) (citing *In re Disciplinary Proceeding Against Trejo*, 163 Wn.2d 701, 721, 185 P.3d 1160 (2008)). But we have also clarified that "[w]hile six months may be the presumptive starting point when suspending an attorney, it is not necessarily the absolute minimum." *Cohen*, 149 Wn.2d at 339. The suspension period may increase or decrease depending on the number of acts of misconduct,[10] the seriousness of the misconduct, and the mitigating and aggravating factors. *See In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 504, 998 P.2d 833 (2000) (Johnson, J., concurring and dissenting) (delineating numerous cases where we have imposed a suspension of less than six months), *abrogated on other grounds by In re Disciplinary Proceeding Against Anschell*, 149 Wn.2d 484, 69 P.3d 844 (2003). A six month suspension period is thus better characterized as a "presumptive starting point" rather than a "minimum." *Cohen*, 149 Wn.2d at 339.

■ ■ ¶43 The hearing officer originally imposed a 1 month suspension each for counts III, IV, and V. It appears he added them up for a consecutive suspension of 3 months. The Board adopted the findings and conclusions of the hearing officer but found the length of the suspension inadequate. It increased the suspension to 18 months. We review sanctions de novo, but where a sanction is recommended by a unanimous board, we will uphold the sanction "in the absence of a clear reason for departure." *In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 717, 72 P.3d 173 (2003) (citing *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 258-59, 66 P.3d 1057 (2003)). "Where recommendations differ, we will generally give more weight to the Board's sanction recommendation

---

[10] A single act of misconduct may result in a violation of several rules of professional conduct. To determine sanctions, we look at the acts of misconduct rather than performing "a mechanical tally of the number of code violations." *Eugster*, 166 Wn.2d at 318.

than the hearing officer's, based on the Board's unique experience and perspective in the administration of sanctions." *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 19, 232 P.3d 1118 (2010) (citing *Cohen*, 150 Wn.2d at 754).

¶44 With respect to discovery violations, McGrath failed to respond to basic discovery requests by failing to make a reasonable inquiry and asserting general and boiler plate responses. When two trial court judges repeatedly compelled him to comply and even sanctioned him for failure to comply, he continued over and over to ignore the court's clear and explicit orders to properly respond to discovery. McGrath flaunted his refusal to obey the court orders, and his cavalier attitude toward his discovery obligations was egregious, intentional, and in bad faith. McGrath violated RPC 8.4(d) (engaging in "conduct that is prejudicial to the administration of justice") and RPC 8.4(c) (engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation") in certifying the accuracy the discovery responses.[11]

¶45 With respect to ex parte contacts, McGrath violated RPC 8.4(h) (prohibiting "manifesting prejudice or bias on the basis of . . . national origin") and RPC 3.5(b) (prohibiting "communicat[ing] ex parte with [a judge] during the proceeding unless authorized to do so"). McGrath intentionally contacted Judge Rogers ex parte with the express purpose of persuading the judge to rule in his favor. In so doing, he caused actual and potential harm to the public's view of the integrity of the bar and the administration of justice.

¶46 Finally, the hearing officer found four aggravating factors and only one mitigating factor. The mitigating factor

---

[11] Although count I (failure to make reasonable inquiries) and count III (false certification of discovery responses) are separate acts, they are part of the same misconduct. It would be difficult to commit one without the other. A lawyer cannot submit discovery responses for which the lawyer failed to make a reasonable inquiry without a certification. In this context, false certification would not be possible without making an inadequate inquiry. For the purpose of imposing sanctions, we will merge the two. But this makes no difference to our disposition.

834

is heavily outweighed by the aggravating factors and therefore does not provide a reason to depart from the Board's recommendation.

## CONCLUSION

¶47 McGrath failed to make reasonable inquiry into the accuracy of responses to discovery requests that he certified as accurate. When ordered by the trial court to respond properly to discovery, he flagrantly failed to fulfill his ethical duty to do so. He further sent ex parte communications to a judge and tried to persuade the judge by making references to the national origin of the opposing party. Finding no clear reason not to follow the Board's recommendation, we order McGrath suspended for 18 months.

MADSEN, C.J.; C. JOHNSON, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, and GONZÁLES, JJ.; and SCHINDLER, J. PRO TEM., concur.