WILLIAM R. LUCERO PRESIDING DISCIPLINARY JUDGE
Youras Ziankovich ("Respondent"), a lawyer licensed in New York but not in Colorado, practices immigration law in Aurora. Partial summary judgment was entered based on a finding that he violated six Colorado Rules of Professional Conduct by charging excessive and nonrefundable fees, failing to keep unearned fees in trust, failing to promptly refund unearned fees, and misrepresenting to a client the date when he mailed an immigration application. At the disciplinary hearing, there was not clear and convincing evidence that Respondent committed a communication violation. The majority decision in this matter is that Respondent's breach of six ethical rules warrants suspension for one year and one day, with three months to be served and the remainder to be stayed upon successful completion of a two-year period of probation, with the requirement of practice monitoring and trust account monitoring. A dissent as to sanctions advocates for a longer served suspension.
*642 I. PROCEDURAL HISTORY
Bryon M. Large, Office of Attorney Regulation Counsel ("the People"), filed a complaint with Presiding Disciplinary Judge William R. Lucero ("the PDJ") on May 26, 2017, alleging that Respondent violated eight Colorado Rules of Professional Conduct. Respondent did not file an answer as required but instead moved to dismiss the case on June 2, 2017, asserting a lack of disciplinary jurisdiction because he is not licensed in Colorado and his law practice is limited to federal immigration cases.
The PDJ denied Respondent's motion and ordered him to answer the complaint by July 27, 2017. On July 19, 2017, Respondent filed with the Colorado Supreme Court a notice of appeal of the PDJ's ruling under C.R.C.P. 251.27. The PDJ granted Respondent's motion to stay the disciplinary case pending appeal, but the Colorado Supreme Court dismissed Respondent's appeal on August 21, 2017. Ten days later the PDJ lifted the stay on the disciplinary case. The PDJ later denied Respondent's motion for a stay pending resolution of a federal action he filed against the People.
On October 6, 2017, Respondent filed an answer, which the People moved to strike. After directing additional briefing,[2] the PDJ granted the People's motion and ordered Respondent to file an amended answer. The PDJ set a three-day trial in this matter for April 10-12, 2018.
By order dated December 12, 2017, the PDJ granted the People's motion to compel disclosures and ordered Respondent to produce his initial disclosures within a week. The PDJ advised Respondent that failure to do so might result in sanctions, including a prohibition against introducing certain evidence at the disciplinary hearing. Respondent did not produce initial disclosures as required. Thus, on January 19, 2018, the PDJ granted the People's motion for sanctions and barred Respondent from presenting undisclosed evidence, including documents and witness testimony.
In his amended answer filed on January 9, 2018, Respondent admitted or denied specific allegations in the complaint, stated that he was without sufficient information to admit or deny certain allegations, partially admitted and partially denied certain allegations without specificity, and contended that certain allegations were "not clear" and thus neither admitted nor denied them. The People then moved to deem various allegations admitted under C.R.C.P. 8(d). The PDJ deemed the motion moot after concluding that Respondent's response to the motion had cured his deficient amended answer by specifying which portions of certain paragraphs he admitted and denied and by denying with explanation certain other allegations. In that order, however, the PDJ found that "Respondent's approach to litigating this case has bordered on contumacious and his conduct in this particular matter has clearly stepped over that line." Based on Respondent's failure to heed both the order directing an amended answer and the rules of civil procedure, the PDJ sanctioned him by mandating application of the aggravating factor of bad faith obstruction of a disciplinary proceeding.
Both parties then moved for summary judgment. By order of March 21, 2018, the PDJ denied Respondent's motion on four separate grounds, including that he filed the motion late and that he disregarded the standards for summary judgment established in the PDJ's scheduling order. On April 5, 2018, the PDJ granted in part and denied in part the People's motion for summary judgment and entered judgment in the People's favor on Claims III-VIII. The PDJ also shortened the three-day disciplinary hearing to a two-day hearing, to be limited to the remaining claims in the People's complaint as well as the sanction for the established rule violations and any other violations proved at the hearing.
*643 On April 10 and 11, 2018, a Hearing Board comprising the PDJ, attorney Murray Weiner, and lay member Dianne V. Truwe held a hearing under C.R.C.P. 251.18. Large represented the People, and Respondent appeared pro se. The Hearing Board considered stipulated exhibits S1-S21,[3] the People's exhibit 8, and the testimony of Hennadiy Zhakyavichyus, Iuliia Vyshniavska,[4] expert witness Lisa Green, and Respondent.
At the outset of the hearing, the People withdrew Claim I of their complaint (alleging a violation of Colo. RPC 1.2(a) ) as well as paragraph 128 of their complaint (claiming that Respondent's alleged surreptitious recording of telephone calls violated Colo. RPC 8.4(c) ).[5] Also at the outset of the hearing, Respondent moved to dismiss the case for lack of jurisdiction, alleging that he did not receive written notice of the hearing under C.R.C.P. 251.18(a). After Respondent confirmed that he had participated in setting the hearing and that he had received the PDJ's scheduling order, the PDJ denied Respondent's motion.
II. FACTS AND RULE VIOLATIONS
Findings of Fact Established on Summary Judgment
Respondent was admitted to practice law in New York in 2014. He is not admitted to practice law in Colorado. He maintains an immigration law practice in Aurora called "Rocky Mountains Immigration Lawyers, Inc."
Iuliia Vyshniavska is a citizen of Ukraine. Hennadiy Zhakyavichyus was, at the time he hired Respondent, a lawful permanent resident of the United States. Vyshniavska experienced entry-related difficulties when arriving in Denver in June 2016, and she, along with Zhakyavichyus, sought Respondent's advice. On June 30, 2016, Vyshniavska and Zhakyavichyus consulted with and retained Respondent at his Colorado office. Respondent waived his consultation fee of $150.00 each. The June 30 meeting lasted about two hours.
Vyshniavska told Respondent that she was afraid after her encounter with U.S. Customs and Border Protection at the Denver airport, and she was concerned about remaining in lawful immigration status since her permission to stay in the United States would expire in three weeks. She wished to stay longer but did not want to risk arrest. Respondent understood that the couple was interested in marrying. Under applicable law, Vyshniavska would not be immediately eligible for residency as the spouse of a lawful permanent resident. She would be eligible, however, if she were married to a U.S. citizen.
On June 30, 2016, Respondent and Vyshniavska signed a fee agreement for the preparation of an application for asylum and a work permit for a flat fee of $3,000.00. In addition, Respondent and Zhakyavichyus signed a fee agreement for naturalization-related legal services for a flat fee of $3,000.00, a sum that included the $680.00 application fee. Both fee agreements had a clause providing that in the event of early termination, Respondent would charge attorney's fees at $250.00 per hour "plus case evaluation in the amount of 1,000."
Also on June 30, 2016, the couple paid Respondent $1,000.00 as a deposit under Zhakyavichyus's fee agreement. Respondent placed the deposit in his corporate account. Although Respondent maintained a New York trust account, he did not and still does not have a Colorado trust account.
On August 1, 2016, Zhakyavichyus paid Respondent $5,000.00, completing payment *644 under both fee agreements. Respondent deposited the $5,000.00 into his corporate checking account.
On August 4, Vyshniavska called Respondent's office to inquire about the status of the cases, but Respondent was not in the office. Vyshniavska spoke twice that day with Respondent's assistant, Alena Dzenisavets, who said that the applications had not yet been filed. Becoming upset, Vyshniavska instructed Dzenisavets to cease work on the cases and said that she was firing Respondent on behalf of herself and Zhakyavichyus.
Later that day, Respondent emailed Vyshniavska in response to her earlier call, stating: (1) "in accordance with ethical regulations of the legal profession, my office cannot complete and mailed [sic] out your claim for the asylum until we receive full payment for our work"; (2) "[a]s a general rule, we reserve at least 1 month after signing a contract and full payment made to get all documents ready to be filed"; (3) "The fact that you are out of status is beyond of [sic] our control ..."; and (4) "Your documents are in processing, and as soon as all will be prepared, we will mail it out." That same day, following Vyshniavska's phone call, Respondent instructed his staff to expedite the filing of Zhakyavichyus's case.
Five days later, on August 9, Zhakyavichyus terminated Respondent's legal services. Respondent told Vyshniavska and Zhakyavichyus that he mailed Zhakyavichyus's naturalization application on August 4 to the Phoenix office of U.S. Citizenship and Immigration Services ("USCIS"). USCIS issued a receipt for the application, showing that it was received on August 15, 2016. This was eleven days after Respondent reported having mailed the application. The postage on the application's envelope in the amount of $1.99 was purchased from Respondent's Stamps.com account. Respondent provided billing information for his Stamps.com account, showing that the only postage purchases in the amount of $1.99 in August 2016 occurred on August 9 and 26, 2016.
After Zhakyavichyus fired Respondent on August 9, Respondent asked him to come to his office and sign a written termination letter if a compromise could not be reached. Zhakyavichyus and Vyshniavska visited Respondent's office the same day and executed written termination statements.
In a letter dated August 9, Respondent acknowledged cancellation of Vyshniavska's $3,000.00 fee agreement and issued a refund check for $290.00. Respondent attached to the letter an invoice in the amount of $2,710.00, listing the following: (1) a case evaluation in accordance with retainer agreement: $1,000.00; (2) an initial client interview: $150.00; (3) two client interviews to collect biographical information: $500.00 at a rate of $250.00 each; (4) two client document reviews: $500.00, at a rate of $250.00 each; (5) two country condition reviews: $500.00, at a rate of $250.00 each; and (6) three document translations: $60.00 at a rate of $20.00 each.
Respondent charged Vyshniavska the case evaluation fee per the fee agreement. The $150.00 charge for the initial client "interview" was for the initial consultation fee, which he had previously waived. Respondent stated that the third item on the invoice-client interviews to collect biographical information-reflected his two-hour interview with Vyshniavska on June 30, 2016. Respondent claimed to have earned the case evaluation fee, the initial interview consultation fee, and the biographical interview fee on Vyshniavska's case all during the same appointment on June 30, for a total of $1,650.00.
Also in a letter dated August 9, 2016, Respondent acknowledged cancellation of Zhakyavichyus's $3,000.00 naturalization contract and issued a refund check for $160.00. Respondent attached to the letter an invoice in the amount of $2,840.00, listing the following: (1) a case evaluation in accordance with retainer agreement: $1,000.00; (2) an initial client interview: $150.00; (3) four instances of preparing client documents for filing: $1,000.00 at a rate of $250.00 each; (4) USCIS's filing fee of $680.00; and (5) a mailing service charge of $10.00.
The $150.00 charge for the initial client "interview" was for the initial consultation fee, which Respondent had previously waived; Respondent said he charged that fee for the sole reason that the contract had been canceled. Respondent claimed to have *645 earned $1,150.00 in Zhakyavichyus's case on June 30, 2016, during the same two-hour meeting in which he earned Vyshniavska's fees. Thus, for the two-hour meeting on June 30, Respondent charged and retained $1,650.00 on Vyshniavska's case and $1,150.00 on Zhakyavichyus's case, for a total of $2,800.00. Respondent did not keep track of his time contemporaneously on his clients' cases.
Both of Respondent's refund checks were drawn from his operating account. Vyshniavska and Zhakyavichyus did not cash those checks. Respondent claims he is holding the couple's money in his firm's New York trust account, not in a Colorado trust account.
Findings of Fact Established at the Hearing[6]
Respondent testified that he began practicing in Colorado in August 2014. Since earning his New York law license that same year, he has not been disciplined in any jurisdiction. He said he attempted to open a trust account at his Colorado bank but was not permitted to do so.[7]
As to the client matter at issue here, Respondent testified that Zhakyavichyus was a friend of his, so he offered a sizeable reduction in his normal fee of $8,000.00 to $10,000.00 for an asylum case. Respondent testified that he recommended Vyshniavska pursue legal residency through Zhakyavichyus applying for naturalization. But that route would take some time and Vyshniavska was fearful of the local police after her experience at the Denver airport, so she asked how she could remain in the United States legally while awaiting the naturalization approval. According to Respondent, he identified two possible avenues: to take college courses and pursue a student visa or to apply for asylum. She selected the asylum option because she did not want to pay for college. Respondent contends that the legal strategy he formulated for the couple-pursuing naturalization for Zhakyavichyus coupled with filing an asylum application for Vyshniavska-was "good enough." He suggested that there was no downside to filing for asylum, arguing that the asylum application would affect Vyshniavska's application for permanent residency only if it were shown that she lied on her asylum application. He noted that the term "frivolous" in the immigration context refers only to lying. Respondent averred that he appropriately communicated with his clients about their cases.
Respondent further testified about his mental state as to the established rule violations. He said that in New York an attorney may deposit a flat fee into a business account, though if the client later terminates the representation, the attorney must refund part of the money from that account. He also argued that New York permits attorneys to secure a "minimum charge" for representations, so his own $1,000.00 fee reflected a minimum charge under New York rules.
As to the mailing of the naturalization application, Respondent testified that when Vyshniavska terminated his representation on August 4, 2016, he understood that the termination was effective only to Vyshniavska, not to Zhakyavichyus. He thus instructed his staff to immediately mail Zhakyavichyus's application, which was already completed. He believed at the time that the application was sent that same day, August 4.
Lisa Green, a Colorado immigration lawyer, offered expert testimony in the area of asylum law. The People proffered her testimony in support of their allegations under Colo. RPC 1.4(b) that Respondent failed to adequately advise Vyshniavska about the merits of and risks associated with her asylum application. Green explained that if a person arriving in the United States fears returning to his or her home country based on persecution premised on any of five specified grounds, the immigrant may be eligible for asylum, though such applicants face an "extremely high" burden.[8] Certain circumstances, *646 such an applicant's voluntary and open return to a home country, will cause an application to be viewed with extreme disfavor. The presence of a war in a home country does not, standing alone, meet the threshold. The applicant must show that he or she has been singled out for persecution or that he or she is part of a group subject to a pattern of persecution. Asylum applicants normally may remain in the United States while an application is pending. In 2016, Green testified, asylum applications were backlogged and the process took over four years to complete. Consistent with Respondent's testimony, Green said that the term "frivolous" in immigration law means that an applicant is lying, not that an application lacks a meritorious legal basis. She also noted that applicants are entitled to withdraw their applications without prejudice.[9]
Zhakyavichyus and Vyshniavska testified to a number of the same facts established on summary judgment, as well as some additional facts. Vyshniavska testified that she arrived in the United States on June 29, 2016, from Poland, where she had been working. Earlier that month, she said, she vacationed in New York and then visited her parents in Ukraine. She said she had no reason to fear government officials in Ukraine during that trip. When she arrived at the Denver airport, she testified, she was detained for three hours by immigration authorities, who treated her in a "rude" manner and threw her belongings on the floor, leaving her "in shock." Ultimately, after the officials interviewed Zhakyavichyus, they permitted her to stay in the United States for just three weeks-a far shorter period than she was expecting.
During the couple's June 30 meeting with Respondent, Vyshniavska recalls Respondent saying that the naturalization path to her legal residency would take more than three weeks. She told him she feared staying past her allotted period and remembers that he suggested applying for asylum as a way to gain legal status in the United States while awaiting Zhakyavichyus's naturalization. Then, Respondent told them, Vyshniavska could withdraw her asylum application. Vyshniavska said that she did not tell Respondent she was afraid of the Ukrainian government harming her, but rather that she was afraid of the war and the political and economic situation in Ukraine, and that she would not want to live and raise children there. She also told him about her recent visit to Ukraine. Vyshniavska remembers Respondent saying that asylum applications from Ukrainians like her had not yet been granted. She understood, she said, that her application probably would not be successful. Zhakyavichyus testified that Respondent did not mention any possible risks associated with the denial of Vyshniavska's asylum application. According to Zhakyavichyus, Respondent told him that some of the legal fees for his naturalization case would reflect Respondent's attendance at his USCIS interview.[10]
Around the time Vyshniavska's three weeks were set to expire, she wrote a statement for her asylum application and sent it to Respondent. He told her that because the statement did not show any direct harm to her, she needed to revise the statement to include details of any abuse that her friends experienced. Zhakyavichyus said that he and Vyshniavska performed their own internet research and concluded that her asylum claim would fail because she was not facing any direct threat in Ukraine.
After the representation ended, Vyshniavska submitted a complaint to the Colorado Bar Association ("CBA"). The CBA's legal fee arbitration committee wrote to Respondent in August 2016, informing him of the fee dispute and asking him to complete and return *647 a form.[11] Instead, Respondent wrote to Vyshniavska, asking her to explain to him why she believed she was entitled to a greater refund and partly explaining the basis for what he charged her.[12] He wrote that "unless you provide us with your written reasoning, we may not start the fee dispute procedure on the forum of CBA's Arbitration Committee."[13] According to Respondent, the normal process in New York is for a client to notify a lawyer about a fee dispute and for the lawyer to prepare an arbitration package. Respondent testified that he attempted to follow this procedure because he believed he was bound by the New York rules.
Zhakyavichyus ultimately gained U.S. citizenship in October 2017. He completed the naturalization process, including attending his USCIS interview, without a lawyer. The couple married on December 14, 2016. As of the date of the disciplinary hearing, Vyshniavska was awaiting a May hearing on her permanent residency application. She said she was representing herself in the matter, relying in part on YouTube videos, because she has no faith in lawyers.
Rule Violations Established on Summary Judgment[14]
Colo. RPC 1.5(a)
Colo. RPC 1.5(a) bars lawyers from charging an unreasonable fee. Facts on summary judgment established that Respondent refunded Vyshniavska only $290.00 from her $3,000.00 fee agreement, and he refunded Zhakyavichyus only $160.00 from his $3,000.00 contract. Respondent charged his clients $150.00 each for an initial consultation fee, despite having previously waived that fee. In Zhakyavichyus's case, Respondent charged that fee for the sole reason that the contract had been canceled. Respondent claimed to have earned the case evaluation fee, the initial interview consultation fee, and the biographical interview fee in Vyshniavska's case all during the same two-hour meeting on June 30, for a total of $1,650.00. Respondent also claimed to have earned $1,150.00 in Zhakyavichyus's case on June 30, during the same two-hour meeting in which he earned Vyshniavska's fees. Thus, for a meeting that lasted only two hours, Respondent charged a total of $2,800.00. He never filed Vyshniavska's application.
The PDJ found as a matter of law that Respondent violated Colo. RPC 1.5(a). The overall fee that he charged was disproportionate to the work he completed, particularly in the case of Vyshniavska, whose application was never filed.[15] Zhakyavichyus's fee also was excessive, partly because Respondent charged the previously waived consultation fee for the sole reason that Zhakyavichyus canceled the contract.[16] In both clients' cases, Respondent's charge of $2,800.00 for a single two-hour meeting-in other words, an hourly rate of $1,400.00-was grossly excessive. Among other reasons, this hourly rate is more than five times Respondent's regular rate set forth in his fee agreement. Last, the facts show that he improperly double-billed Vyshniavska and Zhakyavichyus.[17]
Colo. RPC 1.5(f)
Colo. RPC 1.5(f) states that fees are not earned until a lawyer confers a benefit on a *648 client or performs a legal service for the client. Colo. RPC 1.5(f) goes on to provide that advance unearned fees belong to the client and must be deposited in the lawyer's trust account until earned.[18] The relevant facts established on summary judgment are that Respondent placed the couple's $1,000.00 deposit into a non-trust account on June 30, 2016, and he placed deposited Zhakyavichyus's $5,000.00 payment into a non-trust account on August 1.
Although the PDJ did not find as a matter of law that Respondent violated Colo. RPC 1.5(f) as to the $1,000.00 deposit, the PDJ did find a violation as to the $5,000.00 deposit. Respondent made that deposit into a non-trust account at a time when he had not filed either Vyshniavska's or Zhakyavichyus's applications. The $5,000.00, combined with the earlier payment of $1,000.00, represented full payment under his clients' fee agreements, but Respondent had not completed the agreed-upon work. Further, he charged his clients excessive fees in this matter. Because the excess portion of those fees did not belong to him, Respondent should have kept them in trust, at minimum.
Colo. RPC 1.5(g)
Under Colo. RPC 1.5(g), nonrefundable fees and retainers are prohibited, as are any agreements that unreasonably restrict a client's right to a refund of unearned or unreasonable fees.[19] The undisputed facts on summary judgment show that Respondent's fee agreements characterized the case evaluation fee as nonrefundable and that he in fact treated this fee as nonrefundable. Respondent gave Vyshniavska and Zhakyavichyus agreements providing for a flat fee of $3,000.00. Both fee agreements had a clause stating that in the event of early termination, attorney's fees would be charged at $250.00 per hour "plus case evaluation in the amount of 1,000." The wording "plus " indicates that this fee would be charged even if no work had been performed; the $1,000.00 fee serves as an automatic, nonrefundable charge in the case of early termination. Further, when the couple terminated Respondent's services, he did in fact charge each of them the $1,000.00 case evaluation fee, even though his invoice did not account for having earned the fee through work performed on an hourly basis.
Respondent's fee agreement also unreasonably restricted the clients' right to a refund of unearned or unreasonable fees, in violation of the second portion of Colo. RPC 1.5(g). The fee agreement presented the possibility that the clients would be charged $1,000.00 even if Respondent had performed no work or work worth less than $1,000.00. For clients, the prospect of being charged such a significant sum without receiving any benefit serves as a significant disincentive to terminating a contract.[20]
Colo. RPC 1.15A(a)
Colo. RPC 1.15A(a) requires a lawyer to hold separate from the lawyer's own property any client property that is in the lawyer's possession in connection with a representation. Again, undisputed facts established that Respondent placed the couple's $1,000.00 deposit into a non-trust account on June 30, 2016, and he deposited Zhakyavichyus's $5,000.00 payment into a non-trust account on August 1.
Although the PDJ did not find a rule violation as to the $1,000.00 deposit, the PDJ did find that Respondent violated Colo. RPC 1.15A(a) when he deposited the unearned portion of Zhakyavichyus's $5,000.00 payment into a non-trust account.[21] Respondent *649 made this deposit at a time when he had not filed his clients' applications. The $5,000.00, combined with the earlier payment of $1,000.00, represented full payment under his clients' fee agreements. Respondent was not entitled to treat the entire fee as earned until he completed the agreed-upon work.
Colo. RPC 1.16(d)
Colo. RPC 1.16(d) states that upon termination of representation, a lawyer must take steps reasonably practicable to protect the client's interests, including by refunding any advance unearned fees. Based on the finding under Colo. RPC 1.5(a) that Respondent's fees were excessive and based on the undisputed fact that he retained possession of Vyshniavska's and Zhakyavichyus's fees, the PDJ found a violation of Colo. RPC 1.16(d). A portion of Respondent's fees were excessive and thus unearned, so Respondent should have promptly refunded that portion to the clients.
Colo. RPC 8.4(c)
Colo. RPC 8.4(c) proscribes conduct involving dishonesty, fraud, deceit, or misrepresentation. The People contended that Respondent misrepresented to Zhakyavichyus that he had mailed his naturalization application on August 4, 2016, when in fact Respondent mailed the application on August 9 or later. The undisputed facts establish that Respondent told Zhakyavichyus that he mailed the application on August 4. On August 9, Zhakyavichyus terminated Respondent's services. USCIS received the application on August 15. The postage on the application's envelope in the amount of $1.99 was purchased from Respondent's Stamps.com account. That account shows that the only postage purchases in the amount of $1.99 in August 2016 occurred on August 9 and 26 of that month.
Given Respondent's failure in the summary judgment phase to present any cognizable evidence in his defense, such as an affidavit, the PDJ ruled that the only reasonable inference to be drawn from the facts is that Respondent mailed the application on August 9 or soon thereafter. The PDJ therefore granted judgment on the People's Colo. RPC 8.4(c) claim.
Alleged Violation of Colo. RPC 1.4(b)
The sole substantive claim for the Hearing Board to decide is the People's Colo. RPC 1.4(b) claim. Colo. RPC 1.4(b) requires a lawyer to explain a matter to the extent reasonably necessary to permit the client to make informed decisions about the representation. According to the People, Respondent advised Vyshniavska to apply for asylum simply as a dilatory mechanism while awaiting adjudication of Zhakyavichyus's naturalization application, thereby abusing the system. The People argue that Respondent failed to advise Vyshniavska that her asylum application might be denied and that adverse consequences might result if the application were deemed frivolous. The People also say that Respondent did not explain that she could be eligible for residency based solely on Zhakyavichyus's naturalization. In addition, the People contend that Respondent failed to provide adequate information in general about Vyshniavska's case, leading her to consult the internet about immigration law.
The Hearing Board concludes that the People have not carried their burden on this claim, and it must be rejected. Green did not present expert testimony that Vyshniavska would have faced any legal risks by proceeding on a relatively weak asylum application. Indeed, though Green provided an overview of relevant asylum law principles, she did not opine at all as to the facts of Vyshniavska's case. There is no evidence that Vyshniavska's planned application was frivolous within the meaning of immigration law, nor was there clear and convincing evidence that the application would have been so far afield of the legal standards as to amount to abuse of the system. In fact, Respondent counseled Vyshniavska to revise her initial statement to provide information that would better address the legal standards. In any event, we do not know whether Respondent would have ultimately counseled Vyshniavska to file her *650 asylum application or to abandon the effort upon review of the final application package. Further, the evidence shows that Respondent did counsel Vyshniavska that she could simply await Zhakyavichyus's naturalization, but she preferred not to do so for fear of being detained. Last, Vyshniavska testified that she understood from Respondent that her asylum claim was not particularly strong, and we do not view her decision to consult the internet as clear and convincing evidence that he inadequately communicated with her. We thus find no violation of Colo. RPC 1.4(b).
Respondent's Defenses
Respondent has raised approximately two dozen separate defenses.[22] He mentioned some of the defenses at the hearing, but he generally did not present supportive facts or legal authority in his hearing brief or at the hearing. Many of Respondent's defenses are inconsistent with the summary judgment ruling and are either devoid or nearly devoid of legal and factual support; moreover, the PDJ already granted summary judgment on six claims, and the Hearing Board finds no additional rule violations in this opinion. The Hearing Board thus rejects the following defenses: laches, estoppel, waiver, statute of limitations, lack of grounds of discipline, failure to state sufficient facts to support discipline, failure to state a cause of action, failure to state claims with sufficient particularity, the defense that Respondent's decisions were for good cause and were reasonably based on the facts, the defense that Respondent's conduct was "absolutely justified and privileged," and the defense that Respondent's actions were authorized by applicable law.[23] Further, we reject Respondent's subject matter jurisdiction challenge on the grounds set forth in the PDJ's earlier order on that issue.
The Hearing Board also finds that Respondent's remaining defenses lack merit, and we explain our reasoning as to these defenses in somewhat more detail.
Respondent argues that the People lacked probable cause to investigate this case and that evidence should not be "heard" because he believes Vyshniavska was not the person who filed a request for investigation. The Hearing Board has no authority to review the People's decisions to pursue investigations or file disciplinary charges, and even assuming that Respondent is factually correct, C.R.C.P. 251.9 and 251.10 do not constrain the People's power to undertake an investigation based on the identity of the complaining witness.
Next, Respondent contends that the disciplinary charges "were made in ... bad faith, were political, were for purposes of intimidating, misleading, and coercing Respondent and issued to interfere with Respondent's assistance to his clients in violation of federal law."[24] Though a case may be dismissed or evidence excluded if it is determined that governmental officials acted outrageously or in bad faith, a fact-specific inquiry is required to assess such a defense.[25] Respondent has not identified any facts that would support application of this defense, and we thus reject it.
Respondent also raises the defense that he acted in good faith. To the extent he is asserting that summary judgment should not have been granted, the Hearing Board will not revisit that ruling. We do, however, consider this defense in the context of the sanctions analysis below, under our analysis of Respondent's mental state.
Last, Respondent raises a number of constitutional and federal law defenses, namely alleged violation of the right to due process under the federal and state constitutions, violation of the Interstate Commerce Clause, violation of federal and state First Amendment rights, violation of federal and state Fifth Amendment rights, violation of double jeopardy protections, and violation of 42 U.S.C. § 1983. Respondent does not explain the factual or legal underpinnings of these defenses.
The Colorado Supreme Court has found that disciplinary proceedings comport with *651 due process standards when respondents have notice of the proceedings, are present or are represented at the proceedings, and have the opportunity to cross-examine witnesses and to introduce evidence.[26] Those standards are met here, so Respondent's due process defense falls short.
Respondent does not explain his commerce clause argument. To the extent he is arguing that this disciplinary proceeding frustrates interstate commerce under the dormant commerce clause,[27] that doctrine limits "state legislation inimical to the national commerce."[28] Here, however, Respondent's actions in this case took place within Colorado, and the Hearing Board lacks any basis to find a dormant commerce clause violation.[29]
Turning to Respondent's First Amendment defense, it is well established that a lawyer cannot be punished for activity or speech that is protected by the First Amendment.[30] Here, however, we cannot discern what type of activity Respondent might be viewing as the basis for his First Amendment claim-indeed, whether the defense is premised on the right to free speech, to petition, or otherwise. Without that information, we are at a loss for how to consider this defense, and we thus must reject it.
The same goes for Respondent's Fifth Amendment defense. We do not know whether he is arguing on due process grounds (which we addressed above), self-incrimination grounds, double jeopardy grounds, or otherwise, so we find no merit in this defense. Respondent does separately raise double jeopardy as a defense, but he has not identified any successive prosecutions at issue and we reject that defense.[31]
Finally, Respondent has not specifically identified which "rights, privileges, or immunities secured by the Constitution and laws" he believes he has been deprived of under 42 U.S.C. § 1983, so we find no merit in this defense.
III. SANCTIONS
The American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards ")[32] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[33] When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.
ABA Standard 3.0 - Duty, Mental State, and Injury
Duty : Respondent violated his duty to his clients to safeguard their funds and to exercise candor. Under the ABA Standards , his fee-related violations are denominated as transgressions of his duties to both his clients and the profession, while his refusal to promptly return unearned fees is considered a breach of a professional duty.
*652 Mental State : The PDJ's summary judgment order as to the Colo. RPC 8.4(c) claim was necessarily premised on a determination that Respondent misrepresented facts with a reckless or knowing state of mind.[34] Based on the facts established on summary judgment and at the hearing, the Hearing Board concludes that Respondent recklessly violated that rule. We must still determine Respondent's state of mind as to the remaining rule violations.
Respondent insists that he acted with no more than a negligent mental state in this case, saying he had not read Colorado's rules. He testified that he knew what actions he was taking with respect to his clients' fees but believed he was acting correctly. As to Colo. RPC 1.5(f) and 1.15(A)(a), he argues that he was merely following the New York rules. It appears that in New York, a lawyer is permitted to accept an advance payment of fees without placing those fees in a trust account.[35] Citing NY Rule 8.5, Respondent asserts that he believed he was bound to follow New York's ethical rules, not Colorado's. But this argument is inconsistent with New York Ethics Opinion 1058.[36] That opinion concludes:
If a lawyer is admitted solely in New York but is authorized by Federal law to practice immigration law in another state, and if the lawyer practices only immigration law and practices only in another state, then the lawyer is not required to maintain an attorney trust account in a New York banking institution unless the other state's Rules of Professional Conduct require her to do so.[37]
The opinion points to NY Rule 8.5(b)(2), which "recognizes that New York does not have an interest in applying its own rules where the lawyer's conduct clearly has its predominant effect in another jurisdiction that has disciplinary authority over the conduct."[38] Although New York Ethics Opinion 1058 pertains specifically to NY Rule 1.15, the reasoning therein is applicable to the other ethical rules at issue in this case.
On the whole, the Hearing Board finds that Respondent knowingly committed the misconduct in this case because we find he had the "conscious awareness of the nature or attendant circumstances of [his] conduct," even though he may have lacked "the conscious objective or purpose to accomplish a particular result."[39] "Ignorance of the requirements of a Rule of Professional Conduct does not transform knowing conduct into conduct that is merely negligent."[40] Most notably here, we find Respondent knew that he was charging an excessive fee by billing $2,800.00 for a single two-hour meeting, that he was double-billing his clients, and that he should not have charged Vyshniavska nearly $3,000.00 despite having never completed the agreed-upon work.
*653 Injury : Respondent contends that any injury his clients suffered was nominal at best, arguing that it was their own decision to terminate his representation and pointing out that Zhakyavichyus's application was ultimately successful. Respondent insists that he fully performed under his contract with Zhakyavichyus.
Zhakyavichyus and Vyshniavska both testified that their experience with Respondent undermined their trust in lawyers. Zhakyavichyus feels he will need to do extra diligence when hiring lawyers in the future. He also said that he was uncomfortable about participating in this case because he views Respondent as "vindictive." Zhakyavichyus worried that when Vyshniavska testified at the disciplinary hearing, Respondent might arrange for an immigration agent to show up to "take her to jail." For her own part, Vyshniavska testified that she originally believed the United States was a "country of rules" and that an attorney was someone who could protect you. Now, she believes an attorney is simply a person who takes your money-which is what an "attorney looks like in Ukraine."
Notably, we do not find that the substance of Respondent's representation caused particular harm to his clients. We do, however, conclude that he caused both actual and potential injury to his clients in relation to his improper charging of fees and his dishonesty. Zhakyavichyus was harmed per se when his lawyer failed to tell him the truth about the mailing date of his application because dishonesty vitiates the trust that is fundamental to the client-lawyer relationship. Meanwhile, Vyshniavska saw little benefit from the fees she paid Respondent and was so disheartened by the experience that she felt more comfortable relying on the internet than seeking the help of another lawyer. The evidence indicates that her case has taken longer to resolve as a result. In addition, Respondent caused both clients potential injury by not placing their fees in trust. The requirement that lawyers hold client fees in trust both safeguards client property and protects clients' right to terminate a lawyer's representation.[41] Last, Respondent's disregard of the applicable rules harmed the public and the legal profession by diminishing the public's trust in lawyers.
ABA Standards 4.0-7.0 - Presumptive Sanction
Suspension is the presumptive sanction here under three separate standards. ABA Standard 4.62 provides that suspension is generally appropriate when a lawyer knowingly deceives a client, causing the client injury or potential injury. Suspension is also presumptively warranted under ABA Standard 4.12, which applies when a lawyer knows or should know that he is dealing improperly with client property and causes a client injury or potential injury. Last, ABA Standard 7.2 calls for suspension where a lawyer knowingly engages in conduct that violates a duty owed as a professional, thereby injuring a client, the public, or the legal system.
ABA Standard 9.0 - Aggravating and Mitigating Factors
Aggravating circumstances include any considerations that may justify an increase in the degree of the sanction to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[42] As explained below, the majority applies six factors in aggravation, four of which are entitled to relatively little weight. The majority also applies two mitigating factors, one of which merits comparatively little weight and one of which merits significant weight as to most of Respondent's misconduct.
Aggravating Factors
Dishonest or Selfish Motive - 9.22(b) : The PDJ's summary judgment order established as a matter of law that Respondent misrepresented facts to his client, which shows dishonesty. In addition, we find that Respondent had a selfish motive in double-billing his *654 clients and charging Vyshniavska the full amount of fees quoted for her asylum application even though he never submitted the application. We thus consider this factor in aggravation.
Pattern of Misconduct - 9.22(c) : Although the People urge us to apply this factor, we cannot find that Respondent engaged in the same kind of misconduct in the underlying case on multiple occasions or that he committed similar misconduct with other clients. As such, we decline to apply this aggravator.
Multiple Offenses - 9.22(d) : Although Respondent violated multiple rules, the majority believes these violations generally arise out of a single episode of misconduct. Thus, we apply this factor in aggravation but the majority assigns it relatively little weight.
Bad Faith Obstruction of Disciplinary Proceeding - 9.22(e) : As noted above, the PDJ previously sanctioned Respondent for his failure to comply with the PDJ's orders and the rules of civil procedure by mandating application of this aggravating factor.
Refusal to Acknowledge Wrongful Nature of Conduct - 9.22(g) : Respondent testified at the hearing that he is willing to follow the Colorado rules going forward only if they do not contradict the New York rules. He said he is still not entirely sure whether the Colorado rules apply to his practice. On the whole, Respondent was somewhat resistant to the notion that he acted improperly in this case. On the other hand, the majority believes Respondent's mental orientation is borne in part out of his misunderstanding of applicable disciplinary laws, so the majority applies relatively little weight to this factor.
Vulnerability of Victim - 9.22(h) : Vyshniavska and Zhakyavichyus were vulnerable clients to some extent because they had limited English skills. Vyshniavska also feared deportation in the wake of her entry interview, and she had been given only a limited window of time to remain in the United States with her fiancé. Yet both clients were educated and demonstrated sophistication. We thus consider this factor but the majority accords it relatively little weight.
Indifference to Making Restitution - 9.22(j) : Respondent did not participate in the CBA's informal fee arbitration process, and he did not otherwise provide meaningful restitution to his clients. Although Respondent suggested at the hearing that some restitution might be warranted for Vyshniavska, he rejected the suggestion that Zhakyavichyus was due any restitution. On the other hand, the majority finds that Respondent's failure to participate in the CBA arbitration process was partly explained by his mistaken impression about the applicability of Colorado procedures. We thus apply this factor in aggravation but the majority assigns it relatively little weight.
Mitigating Factors
Absence of Prior Disciplinary Record - 9.32(a) : We consider in mitigation the fact that Respondent has not been disciplined in the course of his legal career. He had only been licensed for two years at the time of his misconduct in this case, however, so we assign relatively little weight in mitigation to this factor.
Inexperience in the Practice of Law - 9.32(f) : We consider in mitigation that Respondent was an inexperienced lawyer at the time of his misconduct. Although this factor does not mitigate Respondent's violation of Colo. RPC 8.4(c),[43] the majority does assign this factor significant weight as to his other misconduct.
Cooperative Attitude Toward Proceedings - 9.32(e): Respondent asks us to weigh this factor in mitigation. The record shows that this factor does not apply. To the contrary, he has refused to comply with multiple orders and rules governing this proceeding.
Character or Reputation - 9.32(g): Respondent suggests that his character and reputation warrants consideration in mitigation. But in support, he offered only his own self-serving testimony, which was very limited *655 on this point and which did not satisfy his burden.
Remorse - 9.32(l) : Although Respondent asserted at the hearing that he is remorseful, we do not believe that he has demonstrated genuine contrition for his conduct.
Analysis Under ABA Standards and Case Law
The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.[44] We are mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[45] Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis. The Colorado Supreme Court has suggested that cases predating the 1999 revision to this state's disciplinary system carry less precedential weight than more recent cases.[46]
Respondent contends that the appropriate sanction for his conduct is no more than a private admonition. The People, by contrast, urge the Hearing Board to impose a served suspension, possibly with the requirement that Respondent formally petition for reinstatement. The People also request an award of restitution and suggest that Respondent be assigned a practice monitor and trust account monitor.
The majority's analysis of relevant case law shows that misconduct similar to Respondent's has resulted in varying levels of sanctions. In re Sather imposed a six-month served suspension when a lawyer misrepresented a fee as nonrefundable and failed to promptly refund unearned fees upon termination,[47] while People v. Wechsler imposed a suspension for a year and a day after a lawyer misrepresented to a client the location of certain funds, failed to provide an accounting over a two-year period, neglected a legal matter, failed to promptly deliver funds to the client, and neglected to place client funds into an appropriate bank account.[48]
By contrast, in People v. Sigley , the Colorado Supreme Court accepted a hearing panel's recommendation to suspend a lawyer for thirty days after misdeeds in two client matters.[49] In the first matter the lawyer untimely refunded unearned fees after termination, and in the second matter the lawyer represented a client despite a conflict of interest and violated Colo. RPC 8.4(c) by deliberately ignoring his obligation to verify the validity of an attorney's fees reaffirmation agreement before pursuing legal action against his client under the agreement.[50] The opinion noted the presence of one mitigator and five aggravators.[51]
Though the majority finds this case law instructive, we understand that we are not bound by prior cases, given that the factual circumstances underlying each case are different.[52] And while the majority recognizes the presumption of a six-month served suspension as a baseline as noted in the dissent, we are not convinced that applying this presumption is appropriate here. The ABA Standards are meant to allow flexibility and discretion in the imposition of a sanction.[53] The majority's deeply held view of this case is that to impose a served suspension of longer than three months would be unduly harsh. Such a sanction would effectively put Respondent, a solo practitioner, out of business and take away his ability to earn a *656 living. Moreover, the majority does not wish to assign undue weight to Respondent's pattern of obstinacy in this disciplinary proceeding, because we believe that the sanction should primarily reflect the actual misconduct as to clients. Here, Respondent's misconduct chiefly involved improper fee practices, which are mitigated by his inexperience in the practice of law, and the People did not establish that his legal advice to his clients caused any harm. The majority recognizes that Respondent has the inclination and potential to serve as a valuable resource to an underserved population of immigrants, and we do not wish to see him permanently abandon this pursuit. We do believe, however, that he requires support in ensuring that his practice in fact benefits the clients he serves.
To that end, the full Hearing Board adopts the People's suggestion that Respondent undergo practice and trust account monitoring. We believe that these remedies would be particularly valuable for Respondent, who has demonstrated significant confusion about the practical requirements attendant to practicing law in Colorado. The full Hearing Board also finds, based on the absence of any evidence showing that Respondent earned Zhakyavichyus's and Vyshniavska's full fees on an hourly basis or otherwise, that an order of restitution is warranted. The People argue that Respondent should refund (1) the "nonrefundable" case evaluation fees of $1,000.00 to both clients, since the PDJ has deemed those fees to be improper, and (2) the $500.00 Respondent charged Vyshniavska for the interview at the June 30 meeting, since that charge represented double-billing. We find this reasoning sound.
In sum, based on the presumptive sanction of suspension, the balance of aggravating and mitigating factors, the guidance provided by case law, and our collective sense of fairness and proportionality, the majority concludes that Respondent should be suspended for one year and one day, with three months to be served and the remainder to be stayed upon the successful conclusion of a two-year period of probation, with the requirements that he submit to practice and trust account monitoring and that he complete both ethics school and trust account school.
IV. CONCLUSION
Respondent transgressed several Colorado Rules of Professional Conduct in representing immigration clients. Because he has demonstrated a need for oversight, including of his law firm's financial practices, he will be suspended from representing clients in Colorado for one year and one day, with three months to be served and the remainder to be stayed upon the successful conclusion of a two-year period of probation, including the requirement that he submit to practice and trust account monitoring.
V. ORDER
The Hearing Board therefore ORDERS :
1. YOURAS ZIANKOVICH , New York attorney registration number 5196324, will be SUSPENDED FROM PRACTICING LAW IN THE STATE OF COLORADO FOR ONE YEAR AND ONE DAY , with THREE MONTHS to be served and the remainder to be stayed upon the successful completion of a TWO-YEAR period of probation, with the conditions identified in paragraph 9 below. The suspension will take effect upon issuance of an "Order and Notice of Suspension."[54]
2. Respondent SHALL promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
3. Within fourteen days of issuance of the "Order and Notice of Suspension," Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia , to notification of clients and other state and federal jurisdictions where the attorney is licensed.
*657 4. The parties MUST file any posthearing motion on or before Thursday, June 14, 2018 . Any response thereto MUST be filed within seven days.
5. The parties MUST file any application for stay pending appeal on or before Thursday, June 21, 2018 . Any response thereto MUST be filed within seven days.
6. Respondent SHALL pay the costs of this proceeding. The People SHALL submit a statement of costs on or before Thursday, June 14, 2018 . Any response thereto MUST be filed within seven days.
7. Respondent SHALL make restitution of $1,500.00 to Iuliia Vyshniavska and $1,000.00 to Hennadiy Zhakyavichyus on or before Thursday, June 28, 2018 . Respondent may not seek reinstatement to practice law in Colorado unless he has complied with this requirement.
8. Should Respondent wish to resume practicing law in Colorado, he will be required to submit to the People, no more than twenty-eight days before the expiration of the served portion of his suspension, an affidavit complying with C.R.C.P. 2151.29(b). Respondent will not be eligible for reinstatement until a monitor has been selected and a monitoring plan approved by the PDJ under subsection 9(b) below.
9. If Respondent is reinstated to practice law in Colorado, he MUST successfully complete a TWO-YEAR PERIOD OF PROBATION subject to the following conditions:
a. He will commit no further violations of the Colorado Rules of Professional Conduct;
b. During any period of probation when Respondent is practicing law in Colorado, he must meet regularly with a monitor, selected by the People in conjunction with Respondent. The monitor will review Respondent's financial accounts and his overall practice for compliance with the Colorado Rules of Professional Conduct, including trust account rules. The monitoring will be designed to verify that Respondent implements and consistently uses financial and trust account management practices to minimize the possibility that his misconduct will reoccur, as well as to verify that he implements and consistently uses effective systems to ensure his compliance with all Colorado Rules of Professional Conduct. During the first year of probation, the meetings will take place monthly; during the second year of probation, the meetings will take place once every two months. Each meeting must include a review of Respondent's firm's financial accounts as well as several of Respondent's client files, selected at random, including fee agreements, invoices, and accounting statements. Respondent and the People must select the monitor and develop a monitoring plan to be filed for approval by the PDJ. No later than the effective date of the probation, Respondent must provide a copy of this opinion to the monitor and execute an authorization for release, allowing the monitor to notify the People if Respondent fails to fully participate in the required monitoring. The monitor must notify the People if Respondent fails to fully participate in the required monitoring. The monitor must submit quarterly reports to the People. Respondent is responsible for bearing all costs of complying with this condition of probation; and
c. Respondent must complete at his own expense the trust account school and ethics school offered by the People, no later than six months after his probation begins.
10. If, during the period of probation, the People receive information that any condition may have been violated, the People may file a motion with the PDJ specifying the alleged violation and seeking an order that requires Respondent to show cause why the *658 stay should not be lifted and the sanction activated for violation of the condition. The filing of such a motion will toll any period of suspension and probation until final action. Any hearing will be held under C.R.C.P. 251.7(e). If Respondent's probation is revoked for any reason, he may not practice law in Colorado unless he successfully petitions for reinstatement to practice law in Colorado under C.R.C.P. 251.29(c).
11. No more than twenty-eight days and no less than fourteen days prior to the expiration of the period of probation, Respondent MUST file an affidavit with the People stating that he has complied with all terms of probation and shall file with the PDJ notice and a copy of such affidavit and application for an order showing successful completion of the period of probation. Upon receipt of this notice and absent objection from the People, the PDJ will issue an order showing that the probation was successfully completed. The order will become effective upon the expiration of the period of probation.
PRESIDING DISCIPLINARY JUDGE LUCERO, concurring in part and dissenting in part:
I concur in Parts I and II of the opinion, including all of the majority's findings of fact and conclusions of law. Although I value the wisdom and experience the majority brings to this case, as well as their close examination of the relevant facts and legal authorities in this matter, I respectfully part ways with the majority as to their sanctions analysis. I believe the appropriate sanction is suspension for one year and one day, with nine months to be served and the remainder to be stayed upon successful completion of a two-year period of probation, with the same conditions and restitution required in Part V of the opinion.
In my view, the Hearing Board departed from the analytical framework established by Attorney F. ,[55] letting their sense of fairness trump the prescribed methodology. In Attorney F., the Colorado Supreme Court set forth a "two-step framework" for analysis: first, a presumptive sanction is identified based on the applicable duty, injury, and mental state, and second, that presumptive sanction may be adjusted based on consideration of aggravating and mitigating factors.[56] Attorney F. indicates that this analysis may be informed by Colorado Supreme Court cases, particularly those decided after the adoption of our current disciplinary system.[57] Although Attorney F. and the ABA Standards provide for flexibility and discretion in a sanctions analysis,[58] "[f]lexibility and discretion are built into " the two-step framework.[59] Thus, the exercise of flexibility and discretion should be tethered to the method of analysis outlined in the ABA Standards , not rooted in a generalized sense that a sanction consistent with the ABA Standards would be unduly harsh. Stated slightly differently, although a "sense" of fairness is a valid consideration, that sense must be integrated into the ABA Standards' framework.[60] This is so because the very purpose of the ABA Standards is to provide for consistency in lawyer disciplinary outcomes.[61] A consistently applied method of analysis helps to promote *659 impartiality and reduces the risk that hearing boards will assign harsher or more lenient sanctions-whether consciously or subconsciously-based on irrelevant factors such as respondents' gender, race, appearance, political orientation, or connections. In sum, the ABA Standards, rather than concerns about the effect of a sanction on the lawyer, must drive the disciplinary sanctions analysis.
Here, I agree with the majority's determination that the presumptive sanction is suspension. A six-month served suspension is typically viewed as the baseline suspension in applying the ABA Standards , to be adjusted based on aggravators and mitigators.[62] Moreover, where multiple charges of misconduct are proved, the ABA Standards counsel that "[t]he ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct."[63]
Next, although I agree in part with the majority's findings as to aggravating and mitigating factors, I would assign average weight to all of the aggravating factors save for bad faith obstruction of the disciplinary proceeding and refusal to acknowledge wrongful nature of misconduct, which are so conspicuous here that they merit significant weight. Instead of applying comparatively little weight to the aggravating factor of multiple rule violations, I would assign this factor average weight because most of the claims at issue here involve distinct types of misconduct. In addition, I would not give Respondent credit for his mistaken impressions about Colorado disciplinary law, either in the context of Standard 9.22(g) (refusal to acknowledge wrongful nature of conduct) or 9.22(j) (indifference to making restitution), because lawyers practicing in Colorado are tasked with understanding the applicable rules. Also as to Standard 9.22(j), I note that the letter Respondent received from the CBA explicitly directed him to submit a response to the CBA, not to his client, and he disregarded those directions. And finally, immigration clients are typically considered vulnerable victims under the ABA Standards ,[64] and I view Respondent's clients' language skills and Vyshniavska's tenuous legal status as meaningful vulnerabilities. As to mitigation, I would assign only average weight to Respondent's inexperience because he steadfastly refused to even consider the possibility that he should educate himself about Colorado law. Thus, I would apply six aggravating factors, two weighted heavily, and two mitigating factors, one weighted comparatively lightly.
As to the applicable case law, I note that the Sather court's imposition of a six-month suspension did not take into account the attorney's violation of Colo. RPC 1.15, since the court had not previously clarified application of that rule.[65] Had the Colo. RPC 1.15 violation been considered for sanctions purposes, the Sather court noted, a lengthier suspension of a year and a day likely would have been appropriate.[66] Although I find Sigley's guidance useful, I do note that the hearing *660 panel's recommendation to suspend that lawyer for thirty days was an uncontested recommendation.[67] In addition, Sigley carries less persuasive weight because the opinion did not select a presumptive sanction.[68] Thus, relevant case law-chiefly Sather and Wechsler - suggests that a lengthy suspension would be appropriate under the facts here. The majority opinion, however, seems not to meaningfully grapple with these authorities.
In sum, based on the relevant aggravators and mitigators-including Respondent's unrelenting pattern of recalcitrance and refusal to acknowledge the rules under which he elected to practice in Colorado-as well as guidance drawn from applicable case law, I find no basis for departing downward from the presumptive sanction of a six-month served suspension. To the contrary, the numerous aggravating factors here mandate an upward adjustment in the sanction to be imposed. Indeed, the serious nature of the aggravating factors in this case deserves weight in the sanctions analysis because aggravators help to assess the level of risk a respondent poses to the public.[69] Based on the facts and aggravating factors here, I find that Respondent poses a risk of significant harm to the public, militating in favor of a meaningful sanction.
The majority emphasizes that Respondent should not be unduly sanctioned for his recalcitrance in this proceeding, arguing that the focus should be placed on the misconduct charged in the complaint and that Respondent's legal advice caused no apparent harm to his clients. Though I do not disagree about the evidence as to Respondent's legal advice, the quantum of harm has already been taken into account in identifying the presumptive sanction, and it should not count doubly as a mitigating factor. In any event, the opinion in this case identifies numerous types of actual and potential harm that Respondent caused in the underlying representations. Further, the majority misconstrues the degree to which my analysis relies on Respondent's pattern of behavior before this tribunal. Even if Respondent had displayed model behavior throughout the course of this disciplinary proceeding, the sanctions analysis called for in Attorney F. would still lead me to conclude that his misconduct requires a meaningful served suspension because the aggravating factors would still outweigh the mitigators.
In sum, I would suspend Respondent for one year and one day, with nine months to be served and the remainder to be stayed upon successful completion of a two-year period of probation, with the same conditions identified in Part V of the opinion. I concur with the majority's determination as to restitution.
/s/ WILLIAM R. LUCERO
WILLIAM R. LUCERO[70] , PRESIDING DISCIPLINARY JUDGE

In his order issued on November 15, 2017, the PDJ stated that Colorado's rules apply in this disciplinary proceeding. See Colo. RPC 8.5(b)(2) (providing that for conduct not in connection with a matter pending before a tribunal, the applicable professional conduct rules are those "of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction....").

At the hearing, Respondent attempted to withdraw his stipulation to the stipulated exhibits, arguing that his deposition (found at exhibit S19) was not signed. The PDJ decided that the stipulated exhibits should be admitted.

A Russian translator certified by the State Court Administrator's Office translated Vyshniavska's testimony.

The PDJ's order granting summary judgment found that six legal claims had been established as a matter of law. However, some of those claims were premised on several distinct theories, and the PDJ did not grant judgment as to each basis of each claim. At the hearing, the People clarified that they did not wish to advance any remaining portions of the claims established on summary judgment, including the allegations of paragraph 128.

Where not otherwise noted, these facts are drawn from testimony.

This assertion was not corroborated, nor did the Hearing Board hear evidence about whether non-Colorado lawyers generally can open Colorado trust accounts.

See also Ex. 8 (Green's report).

Green testified that her normal practice in an asylum case includes conducting an hour-long consultation to determine the client's eligibility for relief, interviewing the client, drafting an affidavit and reviewing it with the client, developing evidence, composing a document list, and preparing the application. The process can take anywhere from days to many months, and Green charges $3,000.00 to $4,000.00 per case.

See also Ex. S19 at 00640 25:5-10 (Respondent's deposition, in which he states that his $3,000.00 fee for a naturalization case normally includes an initial evaluation, preparing the application, preparing the client for the interview, and participating in the interview).

Ex. S13 at 00345.

Ex. S13 at 00344.

Ex. S13 at 00344.

This section presents an abbreviated version of the PDJ's legal analysis in the summary judgment order.

See People v. Kuntz , 942 P.2d 1206, 1207 (Colo. 1997) (in a case of default, finding that a lawyer violated Colo. RPC 1.5(a) by charging a $500.00 flat fee even though he did not file the bankruptcy petition that he was hired to file); People v. Johnson , 946 P.2d 469, 469-70 (Colo. 1997) (accepting a stipulation that a lawyer violated Colo. RPC 1.5(a) by retaining a $200.00 fee for preparation of a guardianship petition even though the lawyer never filed the petition).

See In re Delorme , 795 N.W.2d 293, 293 (N.D. 2011) (finding that a lawyer violated Rule 1.5(a) because, among other things, she billed the client at a rate higher than what she had agreed).

See, e.g., People v. Ogborn , 887 P.2d 21, 22 (Colo. 1994) (finding double reimbursement for expenses improper); In re Kellington , 852 N.W.2d 395, 400 (N.D. 2014) (finding double-billing to be a violation of Rule 1.5(a) ); ABA Annotated Model Rules of Professional Conduct 70 (7th ed. 2011) ("billing the same work to more than one client violates Rule 1.5(a)").

See also Colo. RPC 1.5 cmt. 10 ("The analysis of when a lawyer may treat advances of unearned fees as property of the lawyer must begin with the principle that the lawyer must hold in trust all fees paid by the client until there is a basis on which to conclude that the lawyer has earned the fee....").

See also Colo. RPC 1.5(g) cmt. 18 ("It is unethical for a lawyer ... to characterize any lawyer's fee as nonrefundable. Lawyer's fees are always subject to refund if either excessive or unearned."); In re Cooperman , 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069, 1072 (1994) (ruling that a nonrefundable fee agreement "inappropriately compromises the right to sever the fiduciary services relationship with the lawyer").

See In re Sather , 3 P.3d 403, 413 (Colo. 2000).

See, e.g., People v. Brown, 863 P.2d 288, 290 (Colo. 1993) (finding a violation in part where a lawyer "accepted a retainer from the client [and] deposited the retainer in the law firm's operating account although the retainer had not yet been earned").

Respondent's Hr'g Br. at 4-7.

Respondent's Hr'g Br. at 4-7.

Respondent's Hr'g Br. at 4-5.

People v. Morley , 725 P.2d 510, 515 (Colo. 1986).

People v. Payne , 738 P.2d 374, 375 (Colo. 1987) ; People v. Calder, 897 P.2d 831, 832 (Colo. 1995) ; People v. Williams , 892 P.2d 885, 887 (Colo. 1995).

U.S. Const. art. I, § 8.

S. Pac. Co. v. State of Ariz. ex rel. Sullivan , 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

See, e.g ., Michael W. Loudenslager, "E-Lawyering, the ABA's Current Choice of Ethics Law Rule and the Dormant Commerce Clause: Why the Dormant Commerce Clause Invalidates Model Rule 8.5(b)(2) When Applied to Attorney Internet Representations of Clients," 15 Wm. & Mary Bill Rts. J. 587 (2006) ("The dormant commerce clause ... prohibits a state from regulating activity that does not occur or have a significant effect in its physical boundaries.").

In re Green , 11 P.3d 1078, 1083 (Colo. 2000).

See In re Cardwell , 50 P.3d 897, 905 (Colo. 2002) (finding an absence of proof that "lawyer regulation proceedings impose criminal punishment for purposes of the Double Jeopardy Clause").

Found in ABA Annotated Standards for Imposing Lawyer Sanctions (2015).

See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003).

In re Fisher , 202 P.3d 1186, 1203 (Colo. 2009) ("a mental state of at least recklessness is required for an 8.4(c) violation").

Topic: Advance Payment Retainer; Client Tr. Account , NY Eth. Op. 816 (Oct. 26, 2007). As to the Colo. RPC 1.5(g) violation, Respondent contends that New York permits lawyers to charge "minimum fees." Though we do not disagree, see NY Rule 1.5(d)(4); In re Cooperman, 187 A.D.2d 56, 591 N.Y.S.2d 855, 856 (1993), Respondent's reliance on this aspect of New York law is misplaced. His Colo. RPC 1.5(g) violation is based on the finding that he charged a nonrefundable fee, not a minimum fee, and New York-like Colorado-prohibits nonrefundable fees. In re Cooperman, 591 N.Y.S.2d at 856.

Topic: Choice of Law; Immigration Practice , NY Eth. Op. 1058 (June 10, 2015).

Id . (indicating also that although NY Rule 8.5(b) discusses choice of law in terms of where a lawyer is "licensed," that term has been broadly construed to include lawyers who are otherwise permitted to practice in a jurisdiction). We reject Respondent's contention that there was a conflict between the Colorado and New York rules regarding placement of unearned fees in trust, and that he thereby justifiably felt compelled to follow the New York rules. Colorado's rules do not conflict with New York's rules but rather are more stringent than New York's rules. Thus, Respondent would not have violated New York's rules merely by following Colorado's rules.

Id .

ABA Annotated Standards for Imposing Lawyer Sanctions at xxi.

People v. Foreman , 966 P.2d 1062, 1065 (Colo. 1998).

In re Sather , 3 P.3d at 409 ; see also People v. McGrath , 780 P.2d 492, 493-94 (Colo. 1989) ("Commingling a client's funds with those of the lawyer is a serious violation ..., even in the absence of an actual loss to the client, because the act of commingling subjects the client's funds to the claims of the lawyer's creditors.").

See ABA Standards 9.21 & 9.31.

See In re Cleland , 2 P.3d 700, 705 (Colo. 2000) ("inexperience does not go far in our view to excuse or to mitigate dishonesty, misrepresentation, or misappropriation. Little experience in the practice of law is necessary to appreciate such actual wrongdoing.").

See In re Attorney F. , 285 P.3d 322, 327 (Colo. 2012) ; In re Fischer , 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

In re Attorney F. , 285 P.3d at 327 (quoting In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ).

Id .

3 P.3d at 405.

854 P.2d 217, 220, 223 (Colo. 1993).

917 P.2d 1253, 1256 (Colo. 1996).

Id . at 1255.

Id . at 1256.

See In re Attorney F. , 285 P.3d at 327.

Id. at 326.

In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

285 P.3d at 326-27.

Id .

Id . at 327.

Id. at 326.

Id . (emphasis added).

A generalized sense as to a penalty's perceived harshness cannot be properly integrated into that framework: such a sense does not figure into identifying a presumptive sanction, nor is it a cognizable mitigating factor. Although there is room for identifying mitigating factors other than those explicitly listed in ABA Standard 9.32, In re Rosen , 198 P.3d at 121, aggravators and mitigators consist of relevant facts about the underlying circumstances of the case, and they are meant to assist in "determining the needs of the public." In re Fischer , 89 P.3d at 822. A sanction's effect on a lawyer does not qualify as such, and its consideration in this setting runs counter to the overriding goal in disciplinary proceedings of protecting the public. See People v. Richardson , 820 P.2d 1120, 1121 (Colo. 1991).

In re Attorney F. , 285 P.3d at 326 ; In re Fischer , 89 P.3d at 820.

ABA Standard 2.3 ("Generally, suspension should be for a period of time equal to or greater than six months...."); see also In re Cummings , 211 P.3d 1136, 1140 (Alaska 2009) (imposing a three-month suspension based on a six-month "baseline" set forth in ABA Standard 2.3, considered in conjunction with applicable mitigating factors); In re Moak , 205 Ariz. 351, 71 P.3d 343, 348 (2003) (noting that the presumptive suspension period is six months); In re Stanford , 48 So.3d 224, 232 (La. 2010) (imposing a six-month deferred suspension after considering the "baseline sanction" of six months served and deviating downward from that sanction based on one aggravating factor, four mitigating factors, and no actual harm caused); Hyman v. Bd. of Prof'l Responsibility , 437 S.W.3d 435, 449 (Tenn. 2014) (describing a six-month served suspension as a baseline sanction, to be increased or decreased based on aggravating or mitigating circumstances); In re McGrath , 174 Wash.2d 813, 280 P.3d 1091, 1101 (2012) ("If suspension is the presumptive sanction, the baseline period of suspension is presumptively six months.").

Annotated Standards for Imposing Lawyer Sanctions at xx.

See, e.g., Cincinnati Bar Ass'n v. Sigalov , 133 Ohio St.3d 1, 975 N.E.2d 926, 940 (2012) ; Flowers v. Bd. of Prof'l Responsibility , 314 S.W.3d 882, 899-900 (Tenn. 2010).

3 P.3d at 415.

Id . at 416.

917 P.2d at 1256.

Id .

Cf. In re Cleland , 2 P.3d at 705 ("The reason we consider mitigating factors at all is so we may gauge the level of danger that an attorney poses to the public and, ideally, to arrive at a disciplinary sanction that adequately balances the seriousness of the danger against the gravity of the misconduct.").

The PDJ signs this amended order on behalf of the other Hearing Board members.