WILLIAM R. LUCERO PRESIDING DISCIPLINARY JUDGE
In 2017, Lawrence R. Hill ("Respondent") went to a bar with his wife, where they consumed alcohol and argued in the parking lot. Upon returning home, Respondent verbally threatened his wife while brandishing a baseball bat. He pleaded guilty to menacing, a class-three misdemeanor. Respondent's violation of Colo. RPC 8.4(b) and C.R.C.P. 251.5(b) warrants a suspension of one year and one day, all but six months stayed upon the completion of a three-year period of probation with conditions.
I. PROCEDURAL HISTORY
On July 18, 2018, Justin P. Moore, Office of Attorney Regulation Counsel ("the People"), filed a complaint with William R. Lucero, the Presiding Disciplinary Judge ("the PDJ"), alleging that Respondent violated Colo. RPC 8.4(b) and C.R.C.P. 251.5(b). Through his counsel, Troy R. Rackham, Respondent answered on August 20, 2018, after receiving an extension of time. On November 21, 2018, the parties stipulated to judgment on the pleadings as to Respondent's violation of Colo. RPC 8.4(b) and C.R.C.P. 251.5(b).
At the hearing on January 17, 2019, the PDJ, along with lawyers Jennifer H. Hunt and Peter B. Goldstein, served on the Hearing Board. Moore represented the People, and Rackham appeared with Respondent. The Hearing Board heard testimony from Respondent, expert witness Chad Emrick, Ph.D., Jefferson County Deputy Cody Erickson, and Susan Hill. The Hearing Board considered stipulated exhibits S1-S16.
II. FACTS AND RULE VIOLATIONS
Respondent took the oath of admission and was admitted to practice law in Colorado on May 26, 1988, under attorney registration number 17447. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[1]
Facts and Rule Violations Established by the Entry of Judgment on the Pleadings
During the evening of April 28, 2017, Respondent and his wife, Susan Hill, went to *1246 the Mirage, a bar in Littleton. After consuming alcohol, Respondent and Ms. Hill argued outside the bar. The argument became physical. Ms. Hill drove home and left Respondent at the bar. Respondent walked home. When he arrived, Respondent found a baseball bat, walked up the stairs, and entered Ms. Hill's bedroom. While there, Respondent verbally threatened Ms. Hill and brandished the bat in a threatening manner.
The police were called, and Respondent was arrested. He was charged in Jefferson County case number 15CR1566 with menacing, a class-five felony. On October 10, 2017, Respondent pleaded guilty to menacing, a class-three misdemeanor. His conduct and guilty plea involved an underlying factual basis of domestic violence.
Respondent's conduct violated Colo. RPC 8.4(b), which proscribes criminal acts that reflect adversely upon a lawyer's honesty, trustworthiness, or fitness as a lawyer, as well as C.R.C.P. 251.5(b), which provides that any criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer constitutes grounds for discipline.
Evidence at the Disciplinary Hearing[2]
Respondent and his wife have been married for twenty-four years.[3] Respondent testified that in 2017 he was a solo practitioner practicing bankruptcy and family law. He said that he has always struggled financially as a lawyer, and his income dropped significantly in 2015 and 2016 because the U.S. economy was doing well and bankruptcy filings decreased. To make ends meet, Respondent took on various odd jobs, such as serving as a courier for FedEx and driving for Uber.
In 2016, Respondent testified, he and his wife were $12,000.00 to $14,000.00 behind on their mortgage payments, and his mortgage company initiated foreclosure proceedings on the family home, setting the sale date in June 2017. The couple considered filing for bankruptcy or taking out a high-interest loan, but neither solution was "workable," he said.
According to Respondent, by April 2017 he felt "agitated," "nervous," and "emotionally distraught" about his financial situation and the impending foreclosure. Ms. Hill testified that during this time they experienced "tremendous" financial stress, which affected them daily.
Also during this period, Respondent said, his twenty-year-old son was facing criminal charges, he and Ms. Hill were experiencing marital problems, and he was working hard to secure full-time employment with little success. To cope with these "extraordinarily stressful" circumstances, Respondent said, he self-medicated with alcohol.
Respondent testified that on the evening of April 28, 2017, he and Ms. Hill decided to go to the Mirage bar to play pool and have some drinks. They both consumed alcohol at the bar.[4] Respondent said that he had three drinks and then wanted to go home because he was feeling tired and distraught, thinking about the foreclosure. He testified that Ms. Hill wanted to stay at the bar, but he convinced her to leave. The couple agreed that Ms. Hill would pay the bar tab while Respondent went to the restroom. They were then to meet by the front bar before leaving. When Respondent did not find Ms. Hill, he was "steamed." Respondent testified that he thought Ms. Hill was socializing instead of paying the tab. Looking back, however, he realizes that his reaction was "emotionally misguided" and that it was "stupid" to have gotten so upset over something so "minimal."
According to Respondent, once in the car, the couple began an argument[5] that devolved into "flapping hands" and "finger pointing." Ms. Hill told him to get out of the car and walk home so he could "cool off." It was snowing, windy, and very cold, Respondent recalled, and he was wearing a thin jacket. Respondent's walk took between *1247 twenty-five and forty minutes.[6] He remembered feeling drunk, agitated, and depressed during the walk; his emotions were "boiling." When he arrived home, he was tired, cold, and angry.[7]
Ms. Hill recounted that Respondent wanted to leave the Mirage and that he became upset when she did not quickly pay the tab. She did not remember Respondent being agitated before going to the bar but said that he becomes more agitated when he drinks. She said that Respondent started yelling at her in the bar and continued to do so in the parking lot. According to Ms. Hill, she thought that Respondent had hit her face in the car, but he might have just been pushing her out the door. His hand did contact her nose, she said, and it was painful. She told him to get out of the car and walk home, hoping that he would "cool off." When she arrived home, she got into her pajamas and went to her bedroom. She said that no one else was home.
Respondent testified that when he arrived home he wanted to "make a statement" to his wife, so he went into the garage and retrieved a children's aluminum baseball bat.[8] He took the bat into Ms. Hill's bedroom.[9] He said that he held the bat with both of his hands. He then shook the bat at Ms. Hill while standing ten to fifteen feet away from her in the doorway and threatening that if she "ever did that again," he would "crack her skull."[10] He then left the room and went downstairs.
Ms. Hill, in contrast, said that Respondent pointed the bat and held it within one to two feet from her face, yelling, "If you ever talk to me again, I will crack your skull, got that?" She said that even though he never struck her or any furniture with the bat, she felt traumatized. She was not concerned that he would physically harm her, however, because he had never done so before. According to Ms. Hill, she called her son, who in turn called 9-1-1.[11]
Respondent testified that within minutes of going downstairs, there were eight to ten police officers at his front door. He said he was surprised that the police had been called, but he let the officers into his home because he respects authority. He felt that he was very honest with the officers about what had happened.
Jefferson County Deputy Cody Erickson responded to the 9-1-1 call and spoke with Ms. Hill at the residence. He said that Deputy Andrew Dillman-who did not testify-took Respondent's statement and wrote a report. Erickson said that Dillman's report was consistent with his own recollection. Erickson recalled Ms. Hill telling him that Respondent punched her in the face in the car outside the Mirage, but he saw no injury so he did not pursue assault charges against Respondent. He also remembered Ms. Hill crying during the interview, stating that she had been terrified that Respondent was going to hit her with the bat. According to Erickson, Ms. Hill told him that Respondent held the bat about a foot from her face. Dillman's report indicates that Respondent told him that he "guess[ed]" he had "threatened" his wife; "held the handle of the bat and extended the barrel out" near his wife's face; and he yelled to Ms. Hill, "Don't ever do that to me again."[12] The police report does not mention any report by Respondent that he had threatened to crack his wife's skull.
Respondent was arrested[13] that evening and taken to jail, where he spent the weekend. When he left jail, he stayed with his parents for about a month until a mandatory protective order was lifted.
As noted above, Respondent pleaded guilty to a class-three misdemeanor of menacing.[14] This charge includes the element that the defendant "knowingly placed or attempted to *1248 place another person in fear of imminent serious bodily injury."[15] His conduct and plea contained an underlying factual basis of domestic violence.[16] Respondent said that he pleaded guilty because he did not want to put his wife through a trial.[17] Respondent timely reported his conviction to the People.[18] He did not testify or present evidence, however, of having timely reported his conviction to the Committee on Conduct, which acts on behalf of the U.S. District Court for the District of Colorado, and Respondent testified that he predominately practices bankruptcy law in the federal court system.
As a result of the plea, Respondent received eighteen months of supervised probation, which included domestic violence treatment, relapse prevention therapy, and random urinalysis tests.[19] As of the disciplinary hearing, Respondent was in compliance with those requirements. His probation is set to terminate in March 2019.[20]
Respondent acknowledged that his conduct on the evening of April 28, 2017, was serious, but he insisted he acted out of character and he is not a violent man. He regrets his conduct. He realizes that Ms. Hill was fearful that night and that his conduct constitutes domestic violence, and for that he is sorry. He maintained that he never intended to strike or hurt her. He has since learned in anger management classes the importance of being aware of his anger and recognizing when he needs a time out. Looking back, he testified, when he arrived home that evening he should have showered or slept in order to calm down.
Respondent was adamant that he has been sober since April 2017, and he vowed to maintain his sobriety. He admitted to having denied in the past that he was an alcoholic. Previously, he would remain sober for a period of time but would eventually return to using alcohol.[21] He testified that if he drinks again, his father-who has a sizable estate-will disinherit him; he will lose his job; he will negatively affect his relationship with his wife and children; and he will disrupt his "spiritual connection" with his God. He wants to be a highly functional, productive attorney. He also maintained that he has undergone a "lot" of therapy and counseling-although it was not clear if this was in addition to court-ordered therapy-and that he voluntarily attends weekly support meetings through Colorado Lawyers Helping Lawyers, which has helped him maintain his sobriety. Even so, he is aware that a relapse is highly possible, and he is thus willing to be monitored for alcohol use if the Hearing Board imposes probation.
According to Ms. Hill, she realized that Respondent was an alcoholic when, in 2001, he physically assaulted her fifteen-year-old son-Respondent's stepson-after consuming alcohol.[22] After that incident, they underwent family counseling, but Respondent continued to engage in cycles of drinking, abstaining from alcohol, undergoing stressors, and then resuming the use of alcohol. His alcoholism does not usually cause problems, she said, other than that when he drinks he "sits there" and "does nothing."
Ms. Hill said she has noticed a change in Respondent since he completed domestic violence counseling. She thinks he is more self-aware: instead of "blowing up" he just "yells" now. She confirmed that Respondent has been sober since April 2017, and he has, as a result, become calmer, more energetic, and happier. She believes that the incident in April 2017 was isolated, so she is not concerned *1249 for her safety. She testified that although she and Respondent depend on each other to "manage everything," if he drank alcohol again she would leave him. She was adamant that Respondent has only been violent while under the influence of alcohol. Ms. Hill would like to see Respondent monitored for alcohol use but realizes that eventually he will need to self-regulate without supervision.
Respondent testified that unlike in April 2017, he no longer practices law as a "lone wolf." He has practiced law at the Allstate Law Center for the past ten months. He characterized the firm as high volume, with a large support staff. He manages approximately fifty to seventy cases per month, from intake through the filing of a bankruptcy petition. He likes this work because he enjoys assisting people who are struggling financially. According to Ms. Hill, Respondent's full-time position has improved his self-esteem. She is fearful that if he lost this job, he would not have a professional support system and would experience negative financial consequences.
Dr. Emrick's Testimony and Recommendations
Chad Emrick, Ph.D., testified as an expert witness in addiction. In early 2018, Respondent, per the People's request, underwent an independent medical examination ("IME") administered by Dr. Emrick.[23] Dr. Emrick diagnosed Respondent with alcohol use disorder, moderate,[24] but he testified at the disciplinary hearing that Respondent was on the "cusp" of severe alcohol use disorder. He noted also that Respondent reported to him a moderate degree of anxiety and a mild degree of depression and anger.[25]
Dr. Emrick made several recommendations in his IME report and during his testimony to assist Respondent in maintaining his sobriety. Dr. Emrick was concerned that when Respondent's criminal probation ends in March 2019, he will no longer be subject to court supervision. Dr. Emrick thus recommended that Respondent check in annually with an alcohol addiction specialist for two years after his criminal probation ends.[26] Dr. Emrick opined that these check-ins would help Respondent to abstain from alcohol without the structure of any legal requirements.[27] During the hearing, however, Dr. Emrick recommended checking in more frequently than once a year. Should Respondent consume alcohol during the two years after his criminal probation ends, Dr. Emrick recommended that Respondent enter an intensive outpatient alcohol treatment program followed by a non-intensive alcohol treatment program.[28] Finally, Dr. Emrick suggested that Respondent attend weekly meetings with a peer support group.[29]
Dr. Emrick testified that alcohol relapse is always a concern, but he said robust evidence demonstrates that a person's engagement in a social support network-even in a work environment-of people who are supportive of the individual's abstinence is a variable associated with long-term successful outcomes. He thought that Respondent could be at risk for relapse if he lost his current job. Dr. Emrick also testified that regular attendance at a peer support group-such as Colorado Lawyers Helping Lawyers-boosts an individual's chance of recovery compared to that of an individual who does not attend such a group.
Additionally, Dr. Emrick opined that a longer period of sobriety without any relapse can signal a greater possibility of the individual continuing to maintain abstinence. According to Dr. Emrick, however, this general rule does not necessarily pertain when the individual's abstinence occurs within a legal structure, such as monitored probation, as Respondent's sobriety has been. Dr. Emrick was unable to say whether Respondent's abstinence from alcohol arrested his misconduct or whether recurrence of his misconduct was unlikely. Nor would he state whether Respondent's *1250 recovery was demonstrated by a meaningful and sustained period of successful rehabilitation, as Respondent had been subject to probationary supervision since April 2017 and had not demonstrated a period of abstinence apart from court-ordered supervision.
According to Dr. Emrick, when he asked Respondent during his evaluation if he had ever injured a person due to his alcohol use, Respondent told him that he had not. He never mentioned to Dr. Emrick that he had assaulted his stepson in 2001 after drinking alcohol. Dr. Emrick found it upsetting and significant that Respondent did not mention that conviction or the resulting discipline. That assault, Dr. Emrick said, supports the additional conclusion that Respondent has difficulty with anger. Dr. Emrick declined, however, to opine whether Respondent's alcohol use disorder caused his misconduct in April 2017.
III. SANCTIONS
The American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards ")[30] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[31] When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.
ABA Standard 3.0 - Duty, Mental State, and Injury
Duty : Respondent's act of menacing, with an underlying factual basis of domestic violence, violated his duty to the public to maintain standards of personal integrity. He failed to abide by the principle that marital disputes should be resolved without threats of violence.
Mental State : We find that Respondent acted with a knowing state of mind: though he may not have intended to physically harm Ms. Hill, he was certainly aware of the nature and circumstances of his conduct and its potential impact on his wife. His testimony that he intended to "make a statement" to his wife by brandishing the baseball bat supports our finding, as does Ms. Hill's testimony that she was placed in fear of harm. In addition, the charge to which he pleaded guilty included the mens rea of "knowing."
Injury : Respondent's misconduct brings disrepute on the legal profession and helps to perpetuate a negative public perception of lawyers. More important, Respondent caused Ms. Hill emotional trauma.
ABA Standards 4.0-7.0 - Presumptive Sanction
ABA Standard 5.12 establishes suspension as the presumptive sanction in this case. That standard applies when a lawyer knowingly engages in criminal conduct that does not contain the elements listed in ABA Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.[32] We find that Respondent's criminal conduct, which included threats of serious bodily injury in a domestic violence setting, seriously adversely reflects on his fitness to practice.[33]
Because Respondent has been twice suspended in the past for criminal conduct where alcohol was a factor, ABA Standard 8.1(b) arguably could also apply here. ABA Standard 8.1(b) pegs disbarment as the presumptive standard when a lawyer has been suspended for the same or similar misconduct, *1251 [34] yet knowingly engages in further misconduct that harms or potentially harms a client, the public, the legal system, or the profession.
We recognize that ABA Standard 8.0 is unique among the Standards because it serves as an overlay to other presumptive sanctions. The Colorado Supreme Court has elected to apply Standards 8.1(a) or (b) in a variety of cases in which the enumerated elements are present,[35] yet it has not mentioned Standards 8.1(a) or (b) in other cases in which the elements appear to have been satisfied.[36] Though the Colorado Supreme Court has not set forth a framework guiding application of Standard 8.1(b), guidance may be drawn from the tenor of the case law as well as from the Annotated Standards for Imposing Lawyer Sanctions .
As explained in the Annotated Standards, Standard 8.1(b) "protect[s] the public from further misdeeds when lesser sanctions have proved inadequate to dissuade similar misconduct."[37] In addition, Standard 8.1(b) helps to maintain the efficacy of the disciplinary system by deterring further misconduct and providing a clear message to other lawyers.[38] In our view, Standard 8.1(b) normally should be applied where its elements are satisfied so as to promote consistency.[39] Yet in limited circumstances,[40] this Standard may be deemed unsuitable based on factors including the degree of injury or potential injury,[41] whether recidivism appears likely,[42] the degree to which the lawyer acted willfully,[43] the level of similarity between past and present offenses,[44] whether the lawyer has a "long track record of repeating the same misconduct,"[45] and the amount of time that elapsed between past and present offenses.[46]
Here, we do find that the elements of ABA Standard 8.1(b) are satisfied: Respondent was previously suspended for similar criminal misconduct in 2003 and 2008.[47] Like the incident for which he was disciplined in 2003, Respondent's anger in this matter was directed at a family member, and Respondent's consumption of alcohol was a factor in the prior cases as well as the present case. Even *1252 so, we find the level of similarity between Respondent's past and present misconduct insufficient to warrant application of this standard. Respondent's criminal conduct in each case was different: in the first, he pleaded guilty to a third-degree assault;[48] in the second, he pleaded guilty to DWAI and entered a no-contest plea to harassment;[49] and in the present case, he pleaded guilty to misdemeanor menacing.[50] The level of injury was also different in all three cases: in the first, he caused actual physical injury to his stepson;[51] in the second, he caused potential injury when he sought to drive while ability impaired;[52] and in the present case, he caused his wife emotional injury. Further, the amount of time between the past and present offenses is great: sixteen years elapsed between the first offense, and the present offense and eleven years elapsed between the second offense and the present offense. Finally, we take into consideration that neither party advocates for the application of this standard. For these reasons, we decline to apply ABA Standard 8.1(b), and we thus begin our analysis with the presumptive sanction of suspension.
ABA Standard 9.0 - Aggravating and Mitigating Factors
Aggravating circumstances include any considerations that may justify an increase in the degree of the sanction to be imposed, while mitigating circumstances include any factors that may warrant a reduction in the severity of the sanction.[53] The parties have proposed that we apply a variety of aggravators and mitigators. As explained below, we apply four aggravating factors, one of which we weigh significantly, offset by six mitigating factors.
Aggravating Factors
Prior Disciplinary Offenses - 9.22(a) : Respondent has been disciplined twice for engaging in criminal conduct. In case number 03PDJ062, a hearing board suspended him for six months, all stayed pending the successful completion of a two-year period of probation, which included abstaining from alcohol, undergoing alcohol evaluation and treatment, submitting to random monthly breath or urinalysis tests, and completing an eight-hour anger management course.[54] That case arose from Respondent's entry of a guilty plea to a charge of third-degree assault stemming from an incident of family violence that occurred on October 13, 2001,[55] when Respondent consumed five or six mixed drinks at a bar.[56] When he returned home, he confronted his stepson about giving his cell phone to a friend.[57] Respondent struck his stepson in the face, breaking his nose.[58] In the criminal case, Respondent was sentenced to one year of supervised probation and continued treatment for alcohol and anger management issues.[59] He also had to refrain from alcohol use.[60]
In case number 07PDJ062, the PDJ approved a conditional admission of misconduct on January 25, 2008, suspending Respondent for one year and one day, all but thirty days stayed upon the successful completion of a three-year period of probation with conditions.[61] The conditions included abstaining from alcohol use, participating in an eighteen-month Antabuse program, and completing an intensive outpatient program.[62] Respondent's misconduct in that case stemmed *1253 from two underlying criminal cases. In the first case, Respondent pleaded guilty to DWAI and was sentenced to twelve months of probation, during which time he was to refrain from alcohol, obtain an alcohol evaluation, and participate in recommended treatment.[63] In the second case, Respondent became intoxicated while golfing.[64] He was asked to leave the golf course, and a police officer questioned him as he walked to his vehicle.[65] He was placed under arrest.[66] While at the police station, Respondent punched an officer in the arm and pushed the officer on the chest. He was charged with felony assault, driving under restraint (alcohol related), and disorderly conduct.[67] On June 20, 2007, Respondent entered a no contest plea to harassment, and the other charges were dismissed.[68] He received a deferred judgment of two years with conditions, including anger management and mental health and alcohol evaluations.[69]
Although we recognize that these two disciplinary actions are remote in time, and we do give Respondent some mitigating credit for this fact below, we nevertheless choose to weigh this factor substantially in aggravation. This is because of the serious nature of his prior misconduct, the similarities that do exist, and Respondent's efforts to minimize at the disciplinary hearing what he had done in the past. We are troubled that, on two prior occasions, Respondent's inability to control his anger caused actual or potential harm to family members or third parties. Notably, in all three prior criminal episodes, Respondent's consumption of alcohol was a factor.
Moreover, Respondent has been placed on notice in two disciplinary cases that this type of conduct will result in discipline. Yet it is apparent to us that Respondent has been unwilling, at least in the past, to voluntarily seek treatment for his alcohol use or to even acknowledge that he has a problem with alcohol. We are also concerned that Respondent minimized his past misconduct at the disciplinary hearing, stating that he pleaded guilty to assaulting his stepson because he did not want to put his family through a trial, and that he should have taken his harassment case to trial because he likely would have been acquitted. These statements minimize his past misconduct and fail to account for the influence of alcohol on his ability to control his anger. For these reasons, we choose to significantly weigh this factor in aggravation.
Vulnerability of Victim - 9.22(g) : We consider Ms. Hill a vulnerable victim. Respondent verbally threatened his wife at night while she was in her bedroom, which impeded her ability to flee or to defend herself, if needed.[70] We weigh this factor in aggravation.
Substantial Experience in the Practice of Law - 9.22(i) : Respondent has been licensed in Colorado since 1988. At the time of his misconduct, Respondent had been practicing law for nearly thirty years. We apply relatively little weight to this factor in aggravation, however, because Respondent's lengthy legal experience would not make this particular type of misconduct more or less likely.[71]
Illegal Conduct - 9.22(k) : We apply this factor in aggravation because Respondent committed criminal conduct and was convicted of the class-three misdemeanor of menacing.
*1254 Mitigating Factors
Absence of Dishonest or Selfish Motive - 9.32(b) : Respondent asserts that he is entitled to the benefit of this mitigating factor because he was emotional and angry-not dishonest or selfish-the night he threatened his wife. We do not agree. Through the threat of serious violence, Respondent attempted to exercise control over his wife, who was in a vulnerable position.[72] We do not find such conduct to be unselfish.
Personal or Emotional Problems - 9.32(c) : We heard credible testimony from both Respondent and Ms. Hill that at the time of Respondent's misconduct the couple was struggling financially, including facing foreclosure of the family home, and that this financial stressor negatively influenced Respondent on a daily basis. We also heard testimony that during the same period his son was facing criminal charges and that Respondent and Ms. Hill were having marital problems. These stressors caused Respondent to become agitated and depressed, and he chose to self-medicate by abusing alcohol. Dr. Emrick opined that Respondent was chemically dependent on alcohol during April 2017. We find that Respondent's consumption of alcohol, coupled with his high levels of stress, contributed to his lack of self-control and poor judgment. But, as discussed above, Respondent was aware that he was prone to anger and violence when using alcohol, had self-medicated with alcohol in the past when under stress, and had been previously disciplined for this type of conduct, yet he had not taken adequate steps to address the problem. Accordingly, we accord this mitigator average weight.
Timely Good Faith Effort to Make Restitution or to Rectify the Consequences of Misconduct - 9.32(d) : Respondent urges us to apply ABA Standard 9.32(d) because he completed anger management classes, sought counseling, attended peer assistance support groups, underwent an IME with Dr. Emrick, and has remained sober since April 2017. As to Respondent's argument that he deserves mitigating credit for taking anger management classes, completing counseling, undergoing an IME, and remaining sober, ABA Standard 9.4(a) states that forced or compelled restitution is neither aggravating nor mitigating. We thus do not consider in mitigation Respondent's compliance with probationary conditions. We choose to give him some credit, however, for his voluntary weekly attendance at Colorado Lawyers Helping Lawyers as these meetings will help him handle his stressors better in the future. We also give him some credit for his compliance with the People's request that he undergo an IME.
Full and Free Disclosure to Disciplinary Board or Cooperative Attitude Toward Proceedings - 9.32(e) : Respondent cooperated in this proceeding by stipulating to entry of judgment on the pleadings, thus helping to conserve prosecutorial and judicial resources. He was also forthcoming in the disciplinary proceeding, and we appreciate his candor. We apply this factor in mitigation.
Mental Disability or Chemical Dependency, Including Alcoholism or Drug Use - 9.32(i) : This standard provides that a mental disability or chemical dependency is a mitigating factor when:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability ;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
The Hearing Board heard extensive testimony from Respondent, Ms. Hill, and Dr. Emrick about Respondent's alcohol use. As described in greater detail above, Dr. Emrick found that Respondent suffered from alcohol use disorder, moderate, albeit on the cusp of severe alcohol use disorder, and that in April 2017 Respondent was chemically dependent on alcohol. Dr. Emrick could not state, however, *1255 whether Respondent's alcohol use disorder caused his misconduct on the evening of April 28, 2017; whether Respondent's recovery from his alcohol use disorder was demonstrated by a meaningful and sustained period of successful rehabilitation; whether Respondent's recovery arrested the misconduct; or whether recurrence of that misconduct is unlikely.
In sum, the expert testimony shows that Respondent suffers from a chemical dependency. But the evidence does not demonstrate a direct causal connection between that dependency and Respondent's misconduct on April 28, 2017. Nor does the evidence show that he has been largely rehabilitated absent the confines of legal supervision and that reoccurrence is thus unlikely. Accordingly, we determine that his factor is inapplicable here and choose instead to consider Respondent's alcohol use disorder as a personal and emotional problem under ABA Standard 9.32(c).
Delay in Disciplinary Proceedings - 9.32(j) : Respondent asserts that he should receive mitigating credit under this factor because it took more than a year from the time he self-reported his conviction for a disciplinary hearing to take place. One year for a case to be investigated and to proceed to a trial does not amount to a significant delay in our minds. And Respondent has not demonstrated that he was prejudiced by any such delay.
Imposition of Other Penalties or Sanctions - 9.32(k) : Respondent spent a weekend in jail, was convicted of misdemeanor menacing, and was ordered to fulfill probationary conditions. We consider those penalties as mitigation in this matter.
Remorse - 9.32(l) : Ms. Hill and Dr. Emrick testified that Respondent has expressed genuine remorse. Ms. Hill, in particular, thinks Respondent is remorseful for the harm he caused and for the consequences to his legal career. According to Dr. Emrick, Respondent's remorse was genuine, and he believed Respondent exhibited sincere remorse.
We likewise believe, based on Respondent's manner and demeanor, that he feels remorse for the effect his actions have had on his wife and for the consequences stemming from his misconduct. We are concerned, however, that he attempted to minimize his conduct by making statements demonstrating that he has failed to fully grapple with the seriousness of his misconduct, and such statements serve to minimize his remorse for his own actions. Balancing these considerations, we give this factor average mitigating weight in our analysis.
Remoteness of Prior Offenses - 9.32(m) : Sixteen years passed between the first and the present disciplinary cases and eleven years passed between the second and the present cases. We thus consider this factor, though we decline to accord it greater than average weight, considering the seriousness of the prior offenses, as explained above.
Analysis Under ABA Standards and Case Law
The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.[73] We are mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[74] Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.
The People request imposition of a fully served suspension of one year and one day. They want Respondent to be required to petition for reinstatement under C.R.C.P. 251.29(c), reasoning that he has twice been disciplined for criminal conduct directed at a family member and involving the use of alcohol.
*1256 The People observe that he has also twice been subject to monitored probation, yet he returned to using alcohol and committed another criminal offense. Respondent, meanwhile, argues that the public will be adequately protected with the imposition of a suspension of six months or less, a portion stayed in conjunction with a significant probationary term during which his alcohol use disorder can be adequately supervised.
As explained above, we begin our analysis with the presumptive sanction of suspension. We are mindful that a six-month served suspension is typically viewed as the baseline, to be adjusted based on aggravators and mitigators.[75] We also turn to relevant Colorado cases involving domestic violence to inform our analysis as to the appropriate length of the suspension.
In Hickox, a Colorado case addressing domestic violence in an attorney disciplinary matter, the respondent injured his estranged wife by angrily turning her arm behind her back while escorting her up a staircase, causing her to stumble and fall.[76] The lawyer did not report his conviction to disciplinary authorities, believing that his wife's filing of a grievance relieved him of any such duty.[77] The Colorado Supreme Court found that the length of a suspension in a case involving domestic violence depends on the seriousness of the conduct and the nature of the aggravation and mitigation.[78] The Colorado Supreme Court found the hearing board's imposition of a private admonition inadequate.[79] In making that determination, the Colorado Supreme Court balanced the lawyer's four prior disciplinary offenses and multiple rule violations against three mitigating factors as well as the comparatively moderate level of violence, and ultimately determined that a six-month served suspension was warranted.[80] The Colorado Supreme Court has likewise approved served suspensions in several other cases involving a lawyer's acts of domestic violence.[81]
Here, the six mitigating factors in this case slightly outnumber the four aggravating considerations, and we are swayed by Respondent's personal and emotional problems that contributed to his lack of self-control and poor judgment, his cooperation in this disciplinary proceeding, and, to a lesser extent, his remorse. We are also cognizant that Respondent threatened his wife without causing her any physical injury. Nevertheless, we adjudge Respondent's conduct to be on par with the conduct described in Hickox , given the quantum of emotional injury that Respondent's wife suffered. We are very concerned, meanwhile, by Respondent's prior discipline; specifically we are troubled that he has been disciplined twice in the past for family violence and for criminal conduct involving the use of alcohol, yet he once again faces disciplinary charges for similar (though *1257 not identical) misconduct. Although Respondent previously successfully complied with supervised alcohol monitoring conditions, when his probationary periods ended he reentered a cycle of alcohol abuse and criminal conduct. His efforts to minimize his past and present misconduct also hint at his indifference to his alcohol and anger issues and the combined effect of the two.
Considering the seriousness of Respondent's misconduct, and weighing the severity of that offense against the nature of aggravation and mitigation-particularly Respondent's similar discipline-we find that Respondent should be suspended for a period of one year and one day, with all but six months stayed upon the successful completion of a three-year period of probation with the conditions outlined below.
IV. CONCLUSION
By verbally threatening his wife while wielding a baseball bat, Respondent committed a criminal act that seriously adversely reflects on his fitness as a lawyer. His actions not only harmed his wife but also brought disrepute upon the legal profession. Considered in conjunction with Respondent's past criminal conduct, we conclude that Respondent's present misconduct represents indifference to his fundamental legal obligations. Respondent is thus suspended for one year and one day, all but six months stayed upon the successful completion of a three-year period of probation subject to the conditions outlined below.
V. ORDER
The Hearing Board therefore ORDERS :
1. LAWRENCE R. HILL , attorney registration number 17447 , shall be SUSPENDED FOR ONE YEAR AND ONE DAY, ALL BUT SIX MONTHS STAYED UPON THE SUCCESSFUL COMPLETION OF A THREE-YEAR PERIOD OF PROBATION. The suspension will take effect upon issuance of an "Order and Notice of Suspension."[82]
2. If Respondent wishes to resume practicing law in Colorado, he will be required to submit to the People, no more than twenty-eight days before the expiration of the served portion of his suspension, an affidavit complying with C.R.C.P. 251.29(b).
3. If Respondent is reinstated to practice law in Colorado, he MUST successfully complete a THREE-YEAR PERIOD OF PROBATION subject to the following conditions:
a. Respondent will commit no further violations of the Colorado Rules of Professional Conduct.
b. Respondent shall abstain from using alcohol.
c. Respondent shall abide by alcohol monitoring and treatment conditions as follows:
i. During the first year of probation , Respondent shall undergo random alcohol monitoring at least once per month, with results to be reported to the People and the alcohol addiction specialist as described in this subsection (c)(i) and subsection (c)(ii), if applicable. The method of testing, the testing facility, and any increased frequency of such monitoring shall be determined by an alcohol addiction specialist and set forth in a monitoring plan. The alcohol addiction specialist shall be approved by the People. Respondent shall abide by the monitoring plan. The monitoring plan must be in place no later than fourteen days after Respondent is reinstated to the practice of law. Respondent must provide the monitoring plan to the People no later than seven days after the plan is developed. A positive test or failure to comply with the plan may constitute a violation of probation.
ii. During the final two years of probation , Respondent shall meet quarterly with the alcohol addiction specialist to monitor the stabilization of Respondent's abstinence from alcohol.
*1258 The specialist may develop a treatment plan, which may include additional alcohol monitoring. Respondent must provide any plan to the People no later than seven days after the plan is developed. Respondent shall abide by any treatment plan. The specialist must submit quarterly notifications to the People stating whether Respondent has complied with all terms of his treatment. Respondent must attend his first quarterly meeting no later than three months after his second year of probation begins.
iii. If Respondent wishes to change specialists, he must file a motion seeking the PDJ's approval to do so.
d. During at least the first year of probation but not to exceed the full three years , Respondent shall seek psychotherapeutic treatment from a mental health professional for the anger symptoms and issues identified by Dr. Emrick in his IME report. The nature of the treatment and the duration of the treatment-i.e., whether the treatment should continue for more than one year-shall be determined by the mental health professional and set forth in the treatment plan. The professional must be approved by the People. The professional must be chosen and the treatment plan must be in place no later than fourteen days after Respondent is reinstated to the practice of law. Respondent must send the treatment plan to the People no later than seven days after the plan is developed. Respondent shall abide by the treatment plan. The professional must submit quarterly notifications to the People stating whether Respondent has complied with all terms of his treatment.
e. During the full three-year period of probation , Respondent shall attend weekly meetings of a peer support group, such as Colorado Lawyers Helping Lawyers, SMART Recovery, or LifeRing Secular Recovery Group. He shall submit quarterly reports to the People attesting to his compliance with this provision. If Respondent anticipates circumstances during his probationary period that would prevent him from complying with this condition, such as an extended vacation, he must seek a temporary modification of this provision from the PDJ. Respondent must attend weekly meetings beginning no later than fourteen days after he is reinstated to the practice of law.
f. Respondent shall send to all treatment providers a copy of Dr. Emrick's IME report (exhibit S7), copies of his prior disciplinary history (exhibits S13-S14), a copy of this opinion, and any other records the treatment providers deem necessary to develop monitoring or treatment plans.
g. Respondent shall execute all necessary releases so that the testing facilities and treatment providers are legally permitted to submit to and discuss with the People notifications of Respondent's compliance and treatment plans.
h. Any treatment provider may modify at their professional discretion the initial monitoring or treatment plan consistent with this order. The provider must submit to the People the modified plan no later than seven days after the plan is modified.
i. Respondent is responsible for all costs of evaluation, treatment, and supervision.
j. Respondent is responsible for making all arrangements for compliance with the provisions listed above.
k. Failure to abide by the provisions listed above may constitute a violation of probation.
4. If, during the period of probation, the People receive information that any condition may have been violated, the People may file a motion with the PDJ specifying the alleged violation and seeking an order that requires Respondent to show cause why the stay *1259 should not be lifted and the sanction activated for violation of the condition. The filing of such a motion will toll any period of suspension and probation until final action. Any hearing will be held under C.R.C.P. 251.7(e). If Respondent's probation is revoked for any reason, he may not practice law in Colorado unless he successfully petitions for reinstatement to practice law in Colorado under C.R.C.P. 251.29(c).
5. No more than twenty-eight days and no less than fourteen days prior to the expiration of the period of probation, Respondent MUST file an affidavit with the People stating that he has complied with all terms of probation and shall file with the PDJ notice and a copy of such affidavit and application for an order showing successful completion of the period of probation. Upon receipt of this notice and absent objection from the People, the PDJ will issue an order showing that the probation was successfully completed. The order will become effective upon the expiration of the period of probation.
6. To the extent applicable, Respondent SHALL promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
7. Within fourteen days of issuance of the "Order and Notice of Suspension," Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia, to notification of clients and other jurisdictions where the attorney is licensed.
8. The parties MUST file any posthearing motion or application for stay pending appeal with the Hearing Board on or before Friday, April 5, 2019 . Any response thereto MUST be filed within seven days.
9. Respondent SHALL pay the costs of these proceedings. The People SHALL submit a statement of costs on or before Friday, March 29, 2019 . Any response thereto MUST be filed within seven days.
/s/ Jennifer H. Hunt
JENNIFER H. HUNT
HEARING BOARD MEMBER
/s/ Peter B. Goldstein
PETER B. GOLDSTEIN
HEARING BOARD MEMBER

See C.R.C.P. 251.1(b).

Where not otherwise indicated, these facts are drawn from testimony provided at the hearing.

Stip. Facts ¶ 1.

Stip. Facts ¶ 2.

See also Stip. Facts ¶ 3.

Stip. Facts ¶ 5.

Stip. Facts ¶ 6.

Stip. Facts ¶ 7.

Stip. Facts ¶ 8.

See also Stip. Facts ¶ 9.

Stip. Facts ¶ 10.

Ex. S12.

Stip. Facts ¶ 11.

Stip. Facts ¶ 12.

Stip. Facts ¶ 13.

Stip. Facts ¶ 14.

Ex. S1.

Stip. Facts ¶ 16.

Exs. S2, S8; see Stip. Facts ¶ 15.

Exs. S8-S9, Ex. S15.

As explained in further detail below, Respondent has twice been disciplined for criminal conduct where his alcohol use was a factor. During his disciplinary probation periods, Respondent testified, he was able to remain sober.

This incident is part of Respondent's prior disciplinary history, as discussed in more detail below. Ms. Hill also testified that Respondent hit her son before this incident, when her son was in fifth grade, leading to Respondent's arrest. She recalled that Respondent was drinking before that assault. That event, however, does not figure in Respondent's disciplinary history, nor did we receive any additional evidence about it.

Ex. S7.

Ex. S7 at 00085.

Ex. S7 at 00085.

Ex. S7 at 00086.

Ex. S7 at 00086.

Ex. S7 at 00086.

Ex. S7 at 00087.

Found in ABA Annotated Standards for Imposing Lawyer Sanctions (2015).

See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003).

The elements listed in Standard 5.11 include dishonesty, theft, sale of controlled substances, intentional killing, and other elements that do not apply here.

See In re Hickox , 57 P.3d 403, 405 (Colo. 2002) (finding that a lawyer's conduct seriously adversely reflected on the lawyer's fitness to practice and applying ABA Standard 5.12 where the lawyer pleaded guilty to disturbing the peace, assault, and domestic violence).

Here, Respondent's criminal conduct is similar to his earlier instances of criminal conduct.

See, e.g., People v. Redman , 902 P.2d 839, 839-40 (Colo. 1995).

See, e.g., People v. Ross , 873 P.2d 728, 729-30 (Colo. 1994) ; People v. Wilson , 832 P.2d 943, 945 (Colo. 1992).

Annotated Standards for Imposing Lawyer Sanctions at 390.

See id. at 399.

See ABA Standard 1.3 (stating that the Standards are designed to promote, among other things, "consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions").

See id . (noting that the Standards , while "setting forth a comprehensive system for determining sanctions," are also meant to permit "flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct").

See Ross , 873 P.2d at 730 (giving apparent weight to the fact that the respondent did not harm any client). We note that arguably some degree of injury or potential injury to the legal system and legal profession is always present when a lawyer engages in misconduct of the type for which he or she was previously suspended. Thus, to meaningfully apply the portion of Standard 8.1(b) calling for analysis of injury, careful consideration of the actual degree of injury or potential injury is important.

See Annotated Standards for Imposing Lawyer Sanctions at 390 (discussing the need to "protect the public from further misdeeds when lesser sanctions have proved inadequate to dissuade similar misconduct").

Cf. People v. James , 731 P.2d 698, 700 (Colo. 1987) (emphasizing that the nature of the respondent's actions reflected a "callous disregard" of the rules regulating the practice of law).

See Annotated Standards for Imposing Lawyer Sanctions at 388 ("When past and present offenses are identical or strikingly similar, courts are more likely to find baseline disbarment is warranted under Standard 8.1(b).").

Id. at 389; see also Ross , 873 P.2d at 730 (electing to suspend rather than disbar a respondent who practiced law while suspended, noting that he did not have a particularly extensive disciplinary history).

See id. at 392 (noting that timing considerations may arise in the context of identifying baseline sanctions and applicable aggravation).

See infra ABA Standard 9.0 - Aggravating and Mitigating Factors.

Ex. S14 at 00068.

Ex. S13 at 00042.

Stip. Facts ¶ 12.

See Ex. S14 at 00068.

See Ex. S13 at 00041, 00043.

See ABA Standards 9.21 & 9.31.

Ex. S14 at 6-7.

Ex. S14 at 2.

Ex. S14 at 2.

Ex. S14 at 2.

Ex. S14 at 2.

Ex. S14 at 6.

Ex. S14 at 6.

Ex. S13.

Ex. S13.

Ex. S13 at 00041.

Ex. S13 at 00041.

Ex. S13 at 00041.

Ex. S13 at 00041.

Ex. S13 at 00041-42.

Ex. S13 at 00042.

Ex. S13 at 00042.

People v. Brailsford, 933 P.2d 592, 595 (Colo. 1997) (finding error because a hearing board did not apply ABA Standard 9.22(h) when a lawyer "used the privacy associated with the marital relationship to assault the victim at a time (late at night) and in a place (the family home) when it was unlikely that he would be interrupted by anyone coming to the aid of the victim").

See In re Hickox , 57 P.3d at 407 (agreeing that the attorney's substantial experience in the practice of law was "not relevant since greater or lesser experience would not necessarily make the [criminal] misconduct at issue here less likely").

See State v. Zurmiller , 544 N.W.2d 139, 142 (N.D. 1996) (Levine, J., concurring) (noting that domestic violence is a means of exercising control over a partner).

See In re Attorney F. , 2012 CO 57, ¶ 15, 285 P.3d 322 ; In re Fischer , 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

In re Attorney F. , ¶ 20 (quoting In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ).

See ABA Standard 2.3 ("Generally, suspension should be for a period of time equal to or greater than six months ...."); see, e.g., In re Cummings , 211 P.3d 1136, 1140 (Alaska 2009) ; In re Moak , 205 Ariz. 351, 71 P.3d 343, 348 (2003) ; In re Stanford , 48 So.3d 224, 232 (La. 2010) ; Hyman v. Bd. of Prof'l Responsibility , 437 S.W.3d 435, 449 (Tenn. 2014) ; In re McGrath , 174 Wash.2d 813, 280 P.3d 1091, 1101 (2012).

57 P.3d at 404.

Id .

Id. at 405.

Id .

Id . at 405-08.

See People v. Musick , 960 P.2d 89, 90 (Colo. 1998) (taking into account three aggravators and three mitigators, one of which carried relatively little weight, the Colorado Supreme Court suspended a lawyer for one year and one day for physically assaulting his girlfriend on three separate occasions, causing her pain but no serious injury); People v. Reaves , 943 P.2d 460, 461-62 (Colo. 1997) (approving the parties' stipulation to a six-month suspension based on consideration of one aggravating factor and at least four mitigators where an attorney pleaded guilty to a petty offense of disorderly conduct after throwing a drink at his wife, grabbing her, and engaging in another "pushing and shoving match" and later was convicted of driving while ability impaired); People v. Shipman , 943 P.2d 458, 459-60 (Colo. 1997) (applying two aggravators and six mitigators, the Colorado Supreme Court approved a stipulation to a six-month suspension where an attorney pleaded guilty to driving while ability impaired and also to assault and battery upon his wife); cf. Brailsford , 933 P.2d at 595 (suspending an attorney for one year and one day after the attorney pleaded guilty to third-degree sexual assault arising out of an attack on his wife).

In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.